JRS:DR/AMR/EL
F. #2021R00053

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

JOHN PENA,
    also known as "Tragedy,"
    "Don Tragg," "Last Don,"
    and "Money Baggz,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 21-CR-176 (S-2) (AMD)


MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS *IN LIMINE*


BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Dana Rehnquist
Andrew M. Roddin
Elias Laris
Assistant U.S. Attorneys
    (Of Counsel)

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ..................................................................................................................1

    I.      Facts ...........................................................................................................1

          A.   The Charges ...................................................................................... 1

          B.   The Enterprise: GSM...........................................................................2

          C.   Acts Committed by the Gang ...............................................................4

ARGUMENT .......................................................................................................................8

    I.      Enterprise Evidence ..................................................................................... 8

          A.   Specific Acts the Government Intends to Offer ..................................... 9

          B.   Applicable Law ................................................................................. 11

          C.   Analysis .......................................................................................... 12

    II.     Statements by the Defendant, His Co-Conspirators and Bajandas Are Admissiable. 16

          A.   Applicable Law.................................................................................17

          B.   Discussion .......................................................................................21

    III.    Audio Recordings, Music Videos and Written Rap Lyrics Evidencing Membership and Association with the Enterprise and Containing Evidence of the Enterprise's Criminal Activity and the Defendant's Culpability in the Charged Murders Are Admissable................................................................................................. 29

          A.   Applicable Law.................................................................................30

          B.   Discussion .......................................................................................31

    IV.    911 Calls, Body Worn Camera Footage, and Bajandas's Statements Regarding a Dispute with the Defendat Should be Admitted as Hearsay Exceptions ................... 37

          A.   Applicable Law.................................................................................37

          B.   Discussion .......................................................................................39

    V.     If Defendant Testifies, He May Be Cross Examined on His Criminal History .......... 48

i

        A.    Applicable Law ..................................................................................48

        B.    Discussion ..........................................................................................50

VI.     Certain Business and Public Records are Admissable .................................. 53

        A.    Applicable Law ..................................................................................53

        B.    Discussion ..........................................................................................55

VII.    Anonymous Jury ............................................................................................ 55

        A.    Applicable Law .................................................................................. 55

        B.    Analysis ............................................................................................. 57

        C.    An Anonymous Jury Will Not Prejudice the Defendants ................... 59

CONCLUSION ...................................................................................................................60

# TABLE OF AUTHORITIES

PAGE(S)

Cases

Bourjaily v. United States
   483 U.S. 171 (1987)............................................................................................ 18, 19

Crawford v. Washington
   541 U.S. 36 (2004)..................................................................................................... 21

Georgia v. McCollum
   505 U.S. 42 (1992)..................................................................................................... 60

Jones v. City of New York
   No. 98 Civ. 6493 (LBS), 2002 WL 207008 (S.D.N.Y. Feb. 11, 2002)................... 49

Jones v. N.Y. City Health & Hosps. Corp.
   102 F. App'x 223 (2d Cir. 2004)............................................................................. 50

Melendez-Diaz v. Massachusetts
   557 U.S. 305 (2009)............................................................................................ 53, 54

Old Chief v. United States
   519 U.S. 172 (1997)................................................................................................. 17

Quartararo v. Hanslmaier
   186 F.3d 91 (2d Cir. 1999) ..................................................................................... 20

Rosales-Lopez v. United States
   451 U.S. 182 (1981)................................................................................................. 59

United States v. Alexander
   48 F.3d 1477 (9th Cir. 1995) .................................................................................. 50

United States v. Amato
   15 F.3d 230 (2d Cir. 1994) ..................................................................................... 18

United States v. Amuso
   21 F.3d 1251 (2d Cir. 1994) ................................................................................... 56

United States v. Aponte
   31 F.3d 86 (2d Cir. 1994) ....................................................................................... 20

United States v. Arrington
   867 F.2d 122 (2d Cir. 1989) ................................................................................... 19

United States v. Ashburn
  13-CR-303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014) ................................ 57

United States v. Aulicino
  44 F.3d 1102 (2d Cir. 1995).................................................................................... 56, 57

United States v. Ayers
  No. 20-CR-239 (BMC), 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024) ................................. 30

United States v. Barnes
  604 F.2d 121, 140 (2d Cir. 1979) .................................................................... 57, 59

United States v. Barone
  913 F.2d 46 (2d Cir. 1990) .............................................................................. 21

United States v. Barrett
  750 F. App'x 19 (2d. Cir. 2018) ..................................................................... 30

United States v. Bellomo
  176 F.3d 580 (2d Cir. 1999) ........................................................................... 20

United States v. Black
  No. 13-CR-316 (DLI), 2014 WL 5783067 (E.D.N.Y. Nov. 5, 2014) ..................................... 24

United States v. Blake
  195 F. Supp. 3d 605 (S.D.N.Y. 2016) .............................................................. 24

United States v. Blakey
  607 F.2d 779 (7th Cir. 1979) ........................................................................ 45

United States v. Brown
  254 F.3d 454 (2d Cir. 2001) .......................................................................... 38

United States v. Brown
  254 F.3d at 458 ................................................................... 40, 42, 44, 47

United States v. Brown
  606 F. Supp. 2d 306 (E.D.N.Y. 2009) ............................................................ 49

United States v. Bumagin
  136 F. Supp. 3d 361 (E.D.N.Y. 2015) ............................................................ 51

United States v. Carboni
  204 F.3d 39 (2d Cir. 2000) ........................................................................... 12

United States v. Coiro
    922 F.2d 1008 (2d Cir. 1991) ................................................................. 12

United States v. Coonan
    938 F.2d 1553 (2d Cir. 1991) ................................................................. 12

United States v. Davidson
    308 F. Supp. 2d 461 (S.D.N.Y. 2004) ..................................................... 24

United States v. Davis
    890 F.2d 1373 (7th Cir. 1989) ................................................................ 21

United States v. Deluna
    38 F. App'x 644 (2d Cir. 2002) .............................................................. 25

United States v. Detrich
    865 F.2d 17 (2d Cir. 1988) ..................................................................... 20

United States v. Dominguez-Gabriel
    511 F. App'x 17 (2d Cir. 2013) .............................................................. 20

United States v. Dunloy
    584 F.2d 6 (2d Cir. 1978) ....................................................................... 20

United States v. Ellis
    460 F.3d 920 (7th Cir. 2006) .................................................................. 54

United States v. Estrada
    430 F.3d 606, 618 (2d Cir. 2005) ...................................................... 49, 51

United States v. Flecha
    539 F.2d 874 (2d Cir. 1976) ................................................................... 20

United States v. FNU LNU
    653 F.3d 144 (2d Cir. 2011) ................................................................... 59

United States v. Gigante
    166 F.3d 75 (2d Cir. 1998) ..................................................................... 18

United States v. Gonzalez
    110 F.3d 936 (2d Cir. 1997) ................................................................... 17

United States v. Gonzalez
    399 F. App'x 641 (2d Cir. 2016) ............................................................ 24

United States v. Gotti
    459 F.3d 296 (2d Cir. 2006) .................................................................. 56

United States v. Gotti
    777 F. Supp. 224 (E.D.N.Y. 1991) ...................................................... 59

United States v. Graziano
    558 F. Supp. 2d 304 (E.D.N.Y. 2008) ................................................. 14

United States v. Gupta
    747 F.3d 111 (2d Cir. 2014) ........................................................... 26, 28

United States v. Hayes
    553 F.2d 824, 828 (2d Cir. 1977) ........................................................ 49

United States v. Herron
    762 F. App'x 25 ..................................................................................... 30

United States v. Hill
    658 F. App'x 600 (2d Cir. 2016) .......................................................... 24

United States v. Inserra
    34 F.3d 83 (2d Cir. 1994) ..................................................................... 12

United States v. Jackson
    335 F.3d 170 (2d Cir. 2003) ................................................................. 26

United States v. Jefferson
    215 F.3d 820 (8th Cir. 2000) ................................................................ 19

United States v. Jimenez
    214 F.3d 1095 (9th Cir. 2000) .............................................................. 49

United States v. Johnson
    507 F.3d 793 (2d Cir. 2007) ................................................................. 24

United States v. Johnson
    688 F.3d 494 (8th Cir. 2012) ................................................................ 54

United States v. Jones
    299 F.3d 103 (2d Cir. 2002) ....................................................... 38, 40, 43

United States v. Jordan
    No. 20-CR-305 (LDH), 2024 WL 343970 (E.D.N.Y. Jan. 30, 2024) ...................... 30

United States v. Kadir
    718 F.3d 115 (2d Cir. 2013) ............................................................ 56

United States v. Komasa
    767 F.3d 151 (2d Cir. 2014) ............................................................ 54

United States v. Locascio
    6 F.3d 924 (2d Cir. 1993) .............................................................. 56

United States v. Lombardozzi
    No. 02-CR-273 (PKL), 2003 WL 1907969 (S.D.N.Y. Apr. 17, 2003) ................... 14

United States v. Marin
    669 F.2d 73 (2d Cir. 1982) ............................................................ 24

United States v. Mejia-Valez
    855 F. Supp. 607 (E.D.N.Y. 1994) ........................................... 37, 40, 43, 45

United States v. Miller
    No. 20-CR-331 (LDH) (E.D.N.Y. May 7, 2024) ........................................ 31

United States v. Morgan
    505 F.3d 332, 339 (5th Cir. 2007) .................................................... 54

United States v. Mulder
    273 F.3d 91 (2d Cir. 2001) ............................................................ 19

United States v. Munoz
    765 F. App'x 547, 550 (2d Cir. 2019) ................................................. 19

United States v. Obayagbona
    627 F. Supp. 329 (E.D.N.Y. 1985) ..................................................... 45

United States v. Ortiz
    553 F.2d 782, 785 (2d Cir. 1977) .................................................. 50, 53

United States v. Otufale
    No. 24-CR-170 (KAM), 2024 WL 3391094 (E.D.N.Y. July 12, 2024) ...................... 54

United States v. Paccione
    949 F.2d 1183 (2d Cir. 1991) ...................................................... 56, 57

United States v. Parker
    936 F.2d 950 (7th Cir. 1991) .......................................................... 45

United States v. Payton
   159 F.3d 49, 58 (2d Cir. 1998) ........................................................................ 50, 53

United States v. Persico
   832 F.2d 705 (2d Cir. 1987) ..................................................................... 19, 28, 56

United States v. Pica
   692 F.3d 79 (2d Cir. 2012) ................................................................................ 56

United States v. Pierce
   785 F.3d 832 (2d Cir. 2015) .............................................................................. 30

United States v. Pitre
   960 F.2d 1112 (2d Cir. 1992) ............................................................................ 12

United States v. Qualls
   613 F. App'x 25 (2d Cir. 2015) ........................................................................ 54

United States v. Quinones
   511 F.3d 289 (2d Cir. 2007) .............................................................................. 56

United States v. Rivera
   No. 13-CR-149 (KAM), 2015 WL 1875658 (E.D.N.Y. Apr. 22, 2015) ............................ 14

United States v. Roldan-Zapata
   916 F.2d 795 (2d Cir. 1990) .............................................................................. 52

United States v. Russo
   302 F.3d 37 (2d Cir. 2002) ................................................................................ 18

United States v. Saget
   377 F.3d 223 (2d Cir.) ........................................................................ 19, 21, 26

United States v. Salerno
   868 F.2d 524 (2d Cir. 1987) .............................................................................. 19

United States v. Samet
   200 F. App'x 15 (2d Cir. 2006) ........................................................................ 13

United States v. Schlesinger
   372 F. Supp. 711 (E.D.N.Y. 2005) .................................................................... 19

United States v. Shulman
   624 F.2d 384 (2d Cir. 1980) .............................................................................. 20

United States v. Silva
   715 F.2d 43 (2d Cir. 1983) ............................................................... 59

United States v. Sloman
   909 F.2d 176 (6th Cir. 1990) ............................................................ 49

United States v. Smith
   131 F.3d 685 (7th Cir. 1997) ............................................................ 49

United States v. Spencer
   No. 22-1464-CR, 2023 WL 5091827 (2d Cir. Aug. 9, 2023)............ 43

United States v. Stewart
   433 F.3d 273 (2d Cir. 2006) ............................................................. 19

United States v. Tellier
   83 F.3d 578 (2d Cir. 1996) ............................................................... 18

United States v. Thai
   29 F.3d 785 (2d Cir. 1994) .......................................................... 56, 60

United States v. Thomas
   214 F. Supp. 3d 187, 196 (E.D.N.Y. 2016) .................................. 51, 52

United States v. Thomas
   757 F.2d 1359 (2d Cir. 1985) ................................................. 56, 57, 58

United States v. Tocco
   135 F.3d 116 (2d Cir. 1998) ............................................................. 38

United States v. Tutino
   883 F.2d 1125 (2d Cir. 1989) .................................................... 56, 57

United States v. Tyrell
   840 F. App'x 617 (2d Cir. 2021) ...................................................... 20

United States v. Vario
   943 F.2d 236, 241(2d Cir. 1991) ........................................... 56, 57, 58

United States v. Weiland
   420 F.3d 1062 (9th Cir. 2005) ......................................................... 54

United States v. Whitaker
   No. 21-595, 2024 WL 1266348 (2d Cir. Mar. 26, 2024) ............ 27, 28, 29

United States v. White
   7 F.4th 90 (2d Cir. 2021) ............................................................................... 15

United States v. White
   No. 08-CR-682 (NGG), 2009 WL 4730234 (E.D.N.Y. Dec. 4, 2009) .............................. 51, 52

United States v. Williams
   506 F.3d 151 (2d Cir. 2007) ............................................................................ 21

United States v. Williamson
   512 U.S. 594 (1994) .................................................................................... 26, 27

United States v. Wilson
   493 F. Supp. 2d 397, 400 (E.D.N.Y. 2006) ...................................................... 57, 59

United States v. Wong
   40 F.3d 1347 (2d Cir. 1994) ........................................................................ 11, 56

United States v. Yeley-Davis
   632 F.3d 673 (10th Cir. 2011) ........................................................................ 54

**Statutes**

18 U.S.C. § 922(g)(1) ........................................................................................ 2

18 U.S.C. § 924(j)(1) ......................................................................................... 2

18 U.S.C. § 1959(a)(1) ...................................................................................... 2

18 U.S.C. § 1962(c) .......................................................................................... 2

21 U.S.C. § 846 (b)(1)(D) ................................................................................... 2

21 U.S.C. § 841(b)(1)(D) .................................................................................... 2

**Rules**

Fed. R. Evid. 402 ............................................................................................ 17

Fed. R. Evid. 404(b) ........................................................................... 11, 12, 52

Fed. R. Evid. 609(a)(1) ............................................................................... 49, 51

Fed. R. Evid. 609(a)(1)(B) .............................................................................. 49

Fed. R. Evid. 609(b) .................................................................................... 49, 51

x

Fed. R. Evid. 801(c) ........................................................................................... 17

Fed. R. Evid. 801(d)(2)(A) ............................................................................. 17, 24

Fed. R. Evid. 801(d)(2)(B) .................................................................................. 20

Fed. R. Evid. 801(d)(2)(E) ............................................................................. 18, 24

Fed. R. Evid. 802 ........................................................................................... 17, 24

Fed. R. Evid. 803(1) ....................................................................................... 25, 37

Fed. R. Evid. 803(2) .................................................................................. 37, 38, 40

Fed. R. Evid. 803(3) ........................................................................................... 48

Fed. R. Evid. 803(6) ....................................................................................... 37, 55

Fed. R. Evid. 804(a) ........................................................................................... 25

Fed. R. Evid. 804(b)(3) ......................................................................... 21, 24, 25, 26

Fed. R. Evid. 902(1) ....................................................................................... 54, 55

Fed. R. Evid. 902(2) ....................................................................................... 54, 55

Fed. R. Evid. 902(11) ..................................................................................... 54, 55

Fed. R. Evid. 902(13) ..................................................................................... 54, 55

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its motions <u>in limine</u> seeking to admit: (1) evidence related to the charged enterprise, Gorilla Stone Mafia, as well as evidence relating to the rival "Bugatti" crew and its criminal endeavors; (2) statements by the defendant, his co-conspirators and Mark Bajandas; (3) certain audio recordings, music videos, and written rap lyrics; (4) three 911 calls, certain New York City Police Department ("NYPD") officers' body worn camera ("BWC") footage, and certain statements by Bajandas under the present sense impression and excited-utterance exceptions to the hearsay rule; (5) certain of the defendant's criminal history should the defendant choose to testify; and (6) certain publicly certified records and business records using certifications. Because each of these categories of evidence is relevant and admissible under the Rules of Evidence, and because they are not unduly prejudicial, the government should be permitted to introduce them at trial. The government also respectfully requests that the Court empanel an anonymous jury.

<u>RELEVANT BACKGROUND</u>

I.     <u>Facts</u>[1]

A.     <u>The Charges</u>

The defendant, John Pena, also known as "Tragedy," "Don Tragg," "Last Don," and "Money Baggz," is the leader of the Gorilla Stone Mafia ("Gorilla Stone Mafia," "GSM" or the "Enterprise"), a violent set of the "Untouchable Gorilla Stone Nation" banner of the Bloods street gang that operates out of the Stapleton public housing complex ("Stapleton") in Staten Island, New York. Members and associates of the Enterprise have committed various racketeering acts in furtherance of the gang, including drug dealing, identity theft, fraud, and acts of violence

---

[1]     The factual background set forth below is a summary of the facts relevant to the instant motion and does not set forth all the facts the government will prove at trial.

including shootings, assaults and murder.  By generating money via illicit means and using violence and intimidation to protect the interests of the Enterprise, members and associates of GSM enhanced the its prestige, reputation and position with respect to rival criminal organizations.

On June 15, 2023, a grand jury in this District returned a second superseding indictment (the "S-2 Indictment"), see ECF No. 41, charging the defendant with racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); unlawful use and possession of firearms, in violation of 18 U.S.C. § 924(c)(1)(A)(i)-(iii) (Count Two); murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Three); causing death through the use of firearms, in violation of 18 U.S.C. § 924(j)(1) (Count Four); being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count Five); and conspiracy to distribute and possess with intent to distribute marijuana and cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(D) (Count Six), all in connection with his leadership role in GSM.  Central to these charges are the murders of former GSM members Mark Bajandas and Francisco Gonzalez by the defendant.  See S-2 Indictment.

B.    The Enterprise: GSM

As alleged in the S-2 Indictment, GSM primarily operates in or around the Stapleton area of Staten Island, New York, which is where Pena is based.  Prior to his arrest, the defendant was the leader, also referred to as the "Godfather" or "GF," of GSM.  At trial, one or more witnesses are expected to testify, in substance and in part, about GSM's organizational structure and hierarchy, the rules of the organization and the criminal methods used by GSM members to financially support and contribute to the Enterprise.

For example, evidence at trial will establish that the Gorilla Stone Mafia subscribes to UGSN's oath, pledge, and "constitution," as well as a documented series of coded phrases and mantras, which members of UGSN recite and have transmitted electronically to one another.  GSM has a hierarchical structure that is maintained, in part, through meetings, known as "9s," during

which methods and means to obtain money and commit violent acts are discussed, and during which those attending the meeting are required to put money into the "Kitty." The dues paid to the Kitty include proceeds of illicit activities by members of GSM, including narcotics sales and robberies, and are used to purchase narcotics and firearms and to enrich the gang's members.

Members of the Gorilla Stone Mafia, like other UGSN members, refer to one another as "apes," "gorillas," "gorillaz," and refer to sets of UGSN as "kaves."[2] For example, the Gorilla Stone Mafia is a "kave" of UGSN and many of its members have ties to the Stapleton area of Staten Island. Bugatti (also known as "BMF") is another "kave" of UGSN, which primarily operates out of the Mariners Harbor section of Staten Island, and at the time relevant to the crimes charged in the S-2 Indictment, was one of GSM's primary rivals.

Members can earn rank or move up the hierarchy of UGSN, or their respective sets, by committing acts of violence against members of other gangs, or against members of their own gang who have been deemed disloyal or who are out of favor. Gang members are also expected to make money for the gang by, among other things, selling contraband, such as narcotics, and engaging in fraudulent schemes. Gang members that do not perform tasks assigned to them can be subject to physical retribution from other members of the gang. For example, such individuals may be assaulted at a "9" (a meeting).

As alleged in the S-2 Indictment, GSM generated money and power through numerous criminal activities, including murder, robbery, and assault, and engaged in narcotics trafficking and various forms of fraud, among other crimes. As the leader of GSM, the defendant was directly involved in promoting and engaging in violence and selling narcotics, including

---

[2]     The government expects that evidence introduced at trial will establish that members of the Bloods street gang routinely use the letter "k" in lieu of the letter "c" as a result of the ongoing rivalry between the Bloods and the Crips street gang.

marijuana and crack cocaine, among other crimes.[3]

C.     Acts Committed by the Gang

At trial, the government expects to establish the existence of the Enterprise, the criminal nature of the Enterprise, the membership of the Enterprise, the defendant's involvement in the Enterprise and his commission of the charged offenses through Enterprise-related documents and pictures, co-conspirator communications, surveillance footage and witness testimony, among other evidence.  The government expects to prove Pena's involvement in the murders of Mark Bajandas, also known as "Drama," and Francisco Gonzalez, also known as "Chucky," in furtherance of the criminal scheme.  Additionally, the government also expects to prove Pena's involvement in the gang's narcotics distribution conspiracy.

i.     The Bajandas Murder

At trial, the government expects to prove that on March 9, 2021, Pena attended a memorial on Staten Island for Avanti Brock, also known as "BT" and "BossDon," a GSM member who had been murdered one year earlier.  Bajandas, a former GSM member who defected to the rival Bugatti set of UGSN, also went to Stapleton to attend the memorial.  At approximately 2:04 a.m. on March 10, 2021, on a public street, the defendant shot Bajandas multiple times at close range, killing him.  In the immediate aftermath, several individuals called 911 to report the

---

[3]     At various times, GSM members and associates have included, but are not limited to: Mark Bajandas, also known as "Drama"; Avanti Brock, also known as "BT"; Henry Degroat, also known as "Pugga"; Curtis Jackson, also known as "Birdie"; Juwuan Jackson, also known as "J Guns" or "J Billy"; Jada McCombs; Jahiem McKoy, also known as "Jah" or "Sapa Say" or "Sapa"; David Pena, also known as "Davy";  Luthman Sefu, also known as "Blakka"; Jordan Taylor, also known as "23"; Justice Vick, also known as "Jus"; Vincent Witt, also known as "VI"; Nashawn Hopkins, also known as "Nas"; Tyreek Gomez, also known as "Ty Balla"; Harold Hansen, also known as "Henny"; Destin Burks, also known as "D Rose"; Mark Burks, also known as "Storm"; Sharice Burks, also known as "Sha";  Anthony Morales, also known as "Whiteboy"; David Davilla, also known as "Doughboy"; and Eric Pinero, also known as "LA."

shooting and seek immediate help for Bajandas. Eyewitness testimony, among other corroborative evidence, including surveillance footage, will establish that the defendant was the gunman.

The government also intends to elicit testimony that the defendant himself took credit for the Bajandas murder. For example, after the Bajandas murder the defendant posted the following status on Facebook "Since March 10th My Life Been Drama Free [smile emoji]." The evidence at trial will prove that Bajandas was known by the nickname "Drama," and as described above, the murder occurred on March 10, 2021. As described further herein, the defendant also released a rap video titled "Revenge is Glorious" that describes the defendant's participation in a murder that closely resembles the circumstances of the Bajandas murder. See Section III. Writings recovered from the defendant's jail cell also include statements by the defendant in which the defendant takes responsibility for Bajandas' murder, including, "Turn all my opps into ghost / Francisco[4] I mix them N / Mark / A . . . shhh / Gotta chill . . . they don't Know / Lately how I feel / Like the reaper / If I spot em I'm snatching his soul." (emphasis added).

Evidence obtained from the night of the Bajandas murder will prove that the defendant was with Jawuan Jackson, an associate of GSM, and Henry Degroat, a member of GSM, before, during and after the murder. In addition to the three individuals being together, messages between Degroat and Bajandas on the night of the murder will show that Bajandas asked Degroat if he could attend the memorial to which Degroat responded that he could. Following the murder, Jackson referred to the murder on Facebook. For example, on March 10, 2021, Jackson wrote, "That Boy a Trophy We Gone Put Him On Shelf" and, minutes earlier, "And That's on BossDon [praying hands emoji][writing hands emoji]." The foregoing comments refer to Bajandas as a

---

[4]     As described further below, "Francisco" refers to Francisco Gonzalez, whom the defendant murdered in June 2021.

"trophy," given that he was a respected member of a rival gang, who was now dead ("On Shelf"). Jackson also referred to GSM honoring Brock's memory by retaliating for his murder ("That's on BossDon"). Further, on March 15, 2021, Jackson posted on his Facebook account, "YOU SWITCHED ON THE GANG NOW YOUR ASS IN A BACKWOOD," which references the fact that Bajandas had defected from GSM ("switched on the gang") and joined the Bugatti set of UGSN and now he was dead as a result ("ass in a backwood"). On March 12, Jackson posted "On BossDon I'm Gonna Get Rich SHYNE.IN.PEACE Chicken [emojis]," to which the defendant commented "Ain't no peace til they all [nose-blowing emoji]." Evidence at trial will establish that "wiping" someone (often signified by wiping one's nose) refers to killing them.

      ii.    <u>The Gonzalez Murder</u>

          The government also expects the evidence at trial will show that on June 22, 2021, the defendant murdered Francisco Gonzalez, a former GSM member, by shooting him multiple times in the head while he was asleep in bed next to "Individual-1," another GSM member and the defendant's ex-girlfriend. Following the shooting, Individual-1 called 911 to seek medical help for Gonzalez. NYPD officers arrived on scene minutes later, by which time Gonzalez was already dead. After NYPD officers responded to the scene of the murder, they secured and remained on the scene until the following morning, when Pena was found in a nearby backyard and subsequently arrested. Eyewitness testimony, among other corroborative evidence, including surveillance video and NYPD BWC footage, will establish that the defendant was the gunman.

          Three days after the murder, on June 25, 2021, Pena, while incarcerated, called Individual-1 from a recorded jail line.[5] During this call, Pena made various statements implicating himself in the Gonzalez murder. For example, Pena told Individual-1, "Sorry I hurt you." When

---

[5]      These calls are attached as Exhibits H, I and J.

Individual-1 told Pena "You violated.  Why you had to do that?"  Pena responded, "You still sitting here talking on a recorded phone line talking about how I did something, but I didn't do nothing. I dunno what you talking about."  Later in the conversation Individual-1 said, "You could've woke [N-word]s up.  A real [N-word] would have woke the [N-word] up and look the [N-word] in his face, but you ain't do that."  Pena responded, "Now I'm not no real [N-word]."  Pena called Individual-1 twice more later that day, and in the third call, they had the following exchange:

Pena:            I'm still here.  Still here.

Individual-1:  But he's not.

Pena:            That's the peace that I made.

As with the Bajandas murder, the defendant rapped about the Gonzalez murder in "Revenge is Glorious," including lyrics stating "left his brains on them sheets man what was he thinkin'?," referring to the fact that he had shot Gonzalez in the head while Gonzalez was asleep in bed, leaving his brain matter on the bed underneath him.  As described above, the rap lyrics recovered from the defendant's cell also specifically reference his murder of Gonzalez,  "Turn all my oops into ghost / Francisco  I mix them N / Mark / A … shhh / Gotta chill … they don't Know / Lately how I feel / Like the reaper / If I spot em I'm snatching his soul." (emphasis added).

iii.      GSM's Drug Trafficking Operations

Witness testimony and evidence obtained from cell phones will prove that GSM members enriched themselves by selling controlled substances in and around the Stapleton neighborhood of Staten Island and also in Vermont, and that the defendant was involved in the sales and distribution of marijuana, crack cocaine and heroin.

iv.      GSM's Financial Fraud

The government will prove that members of GSM engaged in fraud, specifically,

7

access device fraud, check fraud and unemployment benefits fraud to earn money for the gang. Specifically, GSM members, including the defendant, acquired victim "profiles" that included victims' names, social security numbers, and credit card numbers, among other information. They then used this information to make unauthorized purchases. GSM members also engaged in unemployment benefits fraud schemes by submitting false claims to receive government funds.

ARGUMENT

I.    Enterprise Evidence

The government intends to introduce at trial evidence of the full narrative of offenses set forth above, including the murders of Bajandas and Gonzalez, and below, nearly all of which forms the basis of one or more crimes charged in the S-2 Indictment and establishes the existence and nature of the charged Enterprise. These include, but are not limited to, the defendant's and his co-conspirators' acts of violence, conspiracy to commit acts of violence, conspiracy to distribute and distribution of narcotics, possession and use of firearms in furtherance of those crimes and acts of fraud. The government also seeks to introduce evidence of murders of GSM members by rival gangs and acts of violence by GSM in retaliation for those murders. As a general matter, witness testimony will establish that members of GSM, including the defendant, could and did maintain and elevate their reputations within the Enterprise by committing acts of violence, including murder. All of this conduct is direct proof of the charged racketeering enterprise and of the purpose element of the charged murder in-aid-of racketeering.

Finally, the government seeks to offer evidence to establish the existence of Bugatti and its engagement in relevant criminal conduct, including acts of violence as set forth below. The government also seeks to introduce evidence about the rivalry between Bugatti and GSM and the defection by certain members of GSM to Bugatti. Such evidence is inextricably intertwined with and necessary to understand the charged crimes and establishes the motive for the defendant's

8

engagement in criminal acts with which he is charged. This evidence is no more prejudicial to the defendant than the crimes with which he is charged and thus does not run afoul of Rule 403.

A.     Specific Acts the Government Intends to Offer

In addition to crimes charged in the S-2 Indictment, the government intends to introduce evidence about the ongoing violent rivalry between GSM and Bugatti, including, but not limited to, the specific acts of violence described below.

1.     Slashing of Francisco Gonzalez and Related Retaliation

On November 27, 2017, the defendant slashed Francisco Gonzalez, who at the time was a member of GSM, over a drug dispute. Specifically, Gonzalez was supposed to sell marijuana for the defendant, but instead, Gonzalez and others used the marijuana. Gonzalez retaliated for the slashing by going to Stapleton—the defendant's home turf—and shooting at the defendant and other GSM members. As a result, Gonzalez was deemed to be "on sight" for GSM, which meant that if any members of GSM saw Gonzalez, they were required to retaliate and kill Gonzalez.

Relatedly, testimony at trial will establish that after the slashing, the defendant believed Gonzalez had cooperated with law enforcement's investigation into the slashing, which contributed further to the conflict between the defendant and Gonzalez.

2.     Murder of David Pena

On December 12, 2019, David Pena, also known as "Davy," a GSM associate and a relative of John Pena, was shot to death on Staten Island. BWC video from responding police officers shows David Pena unresponsive on the ground and the officers taking a gun from David Pena's person. Witness testimony will establish that members of GSM believed that Tysean Benjamin, a member of Bugatti, was responsible for David Pena's murder and that members of GSM wanted revenge against Benjamin and other members of Bugatti as a result.

9

### 3.   Murder of Avanti Brock

On March 12, 2020, GSM member Avanti Brock, also known as "BT," was shot to death in front of a deli on Staten Island.  Video footage from the deli captured the shooting and was circulated among GSM members who believed that Bugatti was responsible for the murder. Social media evidence and witness testimony will establish that following Brock's death, a rift developed between members of GSM that led to, among other things, Bajandas defecting from GSM and joining Bugatti.  That, in turn, led to conflict between the defendant and Bajandas and ultimately led to the defendant killing Bajandas.

### 4.   Non-Fatal Shooting of Tysean Benjamin

On March 26, 2020, Bugatti member Tysean Benjamin was shot on Staten Island and suffered a non-fatal wound to his abdomen.  Witness testimony will establish that GSM members were responsible for this shooting and that the shooting was in direct response to the Brock and David Pena murders, part of the escalating violence between the two sets.

### 5.   Murder of Vincent Witt

On April 14, 2020, GSM associate Vincent Witt, also known as "VI", was fatally shot on Staten Island.  Witness testimony will establish that GSM members believed Bugatti was responsible for Witt's murder and that Witt was murdered because he provided the defendant with Benjamin's location so the defendant could retaliate against Benjamin for David Pena's murder.

### 6.   Murder of Anthony Morales

On October 22, 2021, after the defendant was arrested for the Gonzalez homicide, Bugatti retaliated against GSM for the Bajandas murder by killing Anthony Morales, who was close to the defendant and a GSM associate.  When the defendant saw that individuals were posting about Morales's memorial service on social media, he posted the following to his social media

10

account: "Stop crying and get back."  Witness testimony at trial will establish that the defendant's post was an instruction to GSM members to retaliate ("get back") for Morales' murder.

      B.    <u>Applicable Law</u>

It is well-established that evidence of "other" or "uncharged" crimes is admissible as direct proof in racketeering cases, without reliance on Rule 404(b), because such evidence is necessary to prove the existence and nature of such an enterprise.  Accordingly, the Second Circuit has repeatedly affirmed district courts that admitted evidence of "other" or "uncharged" crimes in racketeering trials where such evidence proved the existence of a racketeering enterprise and/or the means by which the enterprise operated.

The Second Circuit's opinion in <u>United States v. Wong</u>, 40 F.3d 1347 (2d Cir. 1994), is particularly instructive here.  In <u>Wong</u>, the Second Circuit held that the district court properly admitted testimony of an uncharged shootout between rival gangs.   In affirming the district court's ruling, the Second Circuit reasoned as follows:

> [T]he evidence [of uncharged acts] was admissible to prove the existence and nature of the Green Dragons "enterprise" and the participation of defendants-appellants in that enterprise, rather than as evidence of other crimes under Rule 404(b).  The court determined that although other evidence had been admitted regarding the defendants' violent conduct, the challenged evidence was not cumulative because "there is no piece of evidence that the government has proffered that I do not expect will be subject to challenge, if not here during the evidentiary phase of the trial, [then] during summations of counsel."

<u>Id.</u> At 1378.  The Second Circuit held that "this evidence was probative of the existence, organization and nature of the RICO enterprise, a central allegation in the indictment."  <u>Id.</u> Therefore, "'the fact that it may also have been probative of a separate uncharged crime is

irrelevant.'" Id. (quoting United States v. Coiro, 922 F.2d 1008, 1016 (2d Cir. 1991)).[6]

It is also well-established that a prior act is admissible as direct evidence—i.e., it need not be considered as "other crimes" evidence under Rule 404(b)—if it arose "out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."; United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").

C.    Analysis

As an initial matter, the narrative of evidence above establishes the existence and nature of the Enterprise charged in the S-2 Indictment and thus is generally admissible. Additionally, the specific categories of evidence outlined below serve as direct evidence of the

---

[6]    The Second Circuit further held that the district court acted well within its discretion in finding the evidence admissible under Rules 401 and 403.

racketeering enterprise and the other offenses with which the defendant is charged.

In this case, the evidence the government seeks to admit is highly probative and is no more prejudicial than the two murders with which the defendant is charged. The fact that David Pena, Brock, Witt and Morales were shot to death is on the same footing as the defendant's commission of two shooting murders, and carries no additional prejudice as to the defendant, who was not involved in those murders. See Pitre, 960 F.2d at 1120 (2d Cir. 1992) (evidence of uncharged crimes is admissible where they do not involve conduct any more sensational or disturbing than the charged crimes) (internal quotation omitted). The remaining conduct—non-fatal assaults, firearm possession, drug dealing, and financial frauds—while serious, does not rise to the level of two premeditated murders. To the extent any potential prejudice exists, it can be cured by an appropriate limiting instruction, if one is sought by the defendant. See United States v. Samet, 200 F. App'x 15, 20 (2d Cir. 2006) (upholding admission of enterprise evidence where "the district court was careful to give limiting instructions to the jury").

1.   Murders of GSM Members

Evidence that members of GSM were killed and that a rival gang was believed to be responsible for those killings is critical to establishing the existence and activities of the Enterprise, as well as the motive and context for several of the charged crimes. The government does not intend to conduct mini-trials of every murder of a GSM or Bugatti member; rather, the government intends to present limited evidence establishing simply that each murder occurred and who was perceived to be responsible. This perception led to resentment that the defendant—the leader of GSM, who was expected to retaliate on behalf of the Enterprise—was not doing more to take revenge, which, in turn, led him to commit the two murders with which he is charged to maintain his status in the gang. Evidence of the deaths of David Pena, Brock, and Witt is therefore direct evidence of the existence of the Enterprise charged in the S-2 Indictment and the defendant's

motive to commit the alleged murders in furtherance of his standing in the Enterprise.  Indeed, the murder of Bajandas was so intertwined with Brock's murder that it took place at a memorial for Brock approximately one year later.  The murder of Morales, and the defendant's order to retaliate, similarly is direct evidence of the charged racketeering conspiracy and the defendant's role as a violent leader, even though the murder took place after the defendant's arrest.

2.      Slashing of Francisco Gonzalez

Evidence that the defendant slashed Gonzalez in 2017 and believed Gonzalez had provided information against him, as well as evidence that Gonzalez tried to shoot at the defendant, is admissible to show the circumstances surrounding and motivation for the Gonzalez murder, including that retaliation was required against Gonzalez, a former member of GSM, who betrayed the defendant and the gang by (i) stealing the defendant's drugs, (ii) defecting from the gang, (iii) shooting at the defendant and another gang members and (iv) cooperating with law enforcement against the defendant.  Courts in the Second Circuit routinely admit evidence that bears on a relevant relationship between the defendant and another individual or where the evidence furthers a jury's understanding of how the crime came about and the defendant and others' role in it.  See, e.g., United States v. Graziano, 558 F. Supp. 2d 304, 319 (E.D.N.Y. 2008) (admitting prior interactions between the defendant and the victims, including an alleged assault, as background evidence to show the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed); United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1875658, at *3-5 (E.D.N.Y. Apr. 22, 2015) (admitting cooperating witness's testimony about the defendant's prior drug trafficking with associates in his criminal organization as necessary background information to complete the story of the racketeering enterprise, the charged offenses and the relationships between the defendants and other members of his criminal organization); United States v. Lombardozzi, No. 02-CR-273 (PKL), 2003 WL

14

1907969, at *2 (S.D.N.Y. Apr. 17, 2003) (admitting evidence of the defendant's prior extensions of credit to a victim because it provided relevant background evidence regarding the development and nature of the victim's relationship and interactions with the defendant and a co-conspirator); see also United States v. White, 7 F.4th 90, 102 (2d Cir. 2021) ("Moreover, the evidence permitted the jury to find that Howard committed the August 2014 shooting, at least in part, to further his membership in MBG.  Howard's conflict with Samuel stemmed entirely from MBG's rivalry with Killbrook.  The fight in 2011—when Samuel broke Howard's jaw—was part of the ongoing conflict between the two gangs.").

3.   Bugatti

Evidence establishing the existence of the rival gang, Bugatti, and certain of its members' criminal actions, is also necessary to complete the story and to provide crucial background to the offenses charged in the S-2 Indictment.[7]  The government seeks to establish that, much like GSM, Bugatti was a subset of UGSN that abided by a common street code and engaged in criminal conduct to earn money and enhance its power and reputation.  Additionally, the government seeks to offer testimony about how members of one UGSN subset sometimes defected to the other, as in the case of Bajandas, for example.  This defection increased the rivalry between the GSM and Bugatti subsets and resulted in required retaliation on both sides, ultimately resulting in Bajandas's murder.  Finally, the government seeks to introduce evidence showing that GSM members believed that Bugatti was responsible for the murders of certain GSM members, further cementing the rivalry and resulting in certain Bugatti members being "on sight" for GSM.

---

[7]    As discussed further below, the existence of Bugatti will also be established through the introduction of two music videos by Bugatti rapper Jesus Velazquez, also known as "Young Zuess," "Zuessy," and "Zeus."

The evidence outlined here is further direct proof of the defendant's engagement in retaliation against Bugatti, including the murder of one of its members (Bajandas). Such proof is also essential for the jury's understanding of those charges. Without proof that Bugatti existed, its occasional overlap with GSM, and that its members, too, engaged in acts of violence, the jury would be unable to understand why the defendant and GSM members would know of Bugatti, let alone target its members with gunfire. Finally, proof establishing the crimes committed by members of Bugatti carries virtually no prejudice as to the defendant given that he was not involved in the commission of these acts.

For these reasons, the evidence set forth above should be admitted at trial in full.

## II.  Statements by the Defendant, His Co-Conspirators, and Bajandas Are Admissible

During the course of the racketeering conspiracy, the defendant and his co-conspirators had countless conversations in furtherance of the Enterprise, including about (i) the agreed-upon pattern of racketeering, the charged drug distribution conspiracy and efforts to murder rival gang members, such as Francisco Gonzalez; (ii) the Enterprise's means and methods; (iii) the Enterprise members' plans to retaliate against members of Bugatti; and (iv) the defendant's involvement in the murders of Mark Bajandas and Francisco Gonzalez. The government intends to introduce various statements made by the defendant and other members of the Enterprise that were made in furtherance of the charged crimes, as well as statements made by Bajandas about his involvement in GSM and Bugatti. These statements are admissible because they constitute direct evidence of charged crimes, and either are not hearsay or fall within an exception to the hearsay rule under the Federal Rules of Evidence.

16

A.     Applicable Law

1.     Relevance

Under Federal Rule of Evidence 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  "Relevant evidence is admissible" unless specifically excluded by law or the rules.  Fed. R. Evid. 402.  In analyzing relevancy, the Second Circuit has explained that "evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case."  Old Chief v. United States, 519 U.S. 172, 183 (1997).  In sum, the Federal Rules of Evidence establish a liberal standard of admissibility.

2.     Hearsay

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court."  Fed. R. Evid. 802.

a.     Non-Hearsay

Not all out-of-court statements are hearsay.  First, out-of-court statements made by the defendant are not hearsay when introduced by the government in a criminal trial to prove the truth of the facts stated therein, because they are admissions of an adverse party.  See Fed. R. Evid. 801(d)(2)(A).

17

Second, Rule 801(d)(2)(E) excludes from the definition of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." A co-conspirator statement is admissible if the court finds by a preponderance of the evidence that (1) the conspiracy existed at the time the statement was made; (2) both the declarant and the non-offering party were part of the conspiracy; and (3) the statement was made in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171 (1987); see also United States v. Gigante, 166 F.3d 75 (2d Cir. 1998). While the hearsay statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy." Gigante, 166 F.3d at 82 (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)).

With respect to the first requirement, the conspiracy in which the defendant and the declarant are engaged "need not be the crime charged in the indictment" for the statements to be admissible. United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002). It is sufficient that the defendant and the declarant were in a conspiracy together. Id.

"As to the second requirement, statements made during the course and in furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." Gigante, 166 F.3d at 82. "This can include those statements that provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." Id.; see also Russo, 302 F.3d at 46 (statements which "inform . . . [co-conspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)"). Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E). United States v. Amato, 15 F.3d 230, 234

(2d Cir. 1994); see also United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy); United States v. Mulder, 273 F.3d 91, 103 (2d Cir. 2001); United States v. Schlesinger, 372 F. Supp. 711, 720 (E.D.N.Y. 2005).

Statements apprising co-conspirators of past events also often further the conspiracy. See, e.g., United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) ("Statements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group."); United States v. Salerno, 868 F.2d 524 (2d Cir. 1987) (statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators). Even after members of a conspiracy have committed crimes leading to the arrest of many of its members, "the conspiracy does not necessarily end; it continues until its aim has been achieved, it has been abandoned, or otherwise terminated." United States v. Arrington, 867 F.2d 122, 130 (2d Cir. 1989) (admitting co-conspirator statements made after conspirators were arrested and incarcerated). Thus, imprisoned members of a conspiracy can continue to make statements in furtherance of the conspiracy in order to "update" members "on the current status of the conspiracy" and inform them about "the identity and activities of . . . co-conspirators." United States v. Persico, 832 F.2d 705, 716 (2d Cir. 1987). Where co-conspirator statements are non-testimonial, there is no Confrontation Clause concern in the admission of co-conspirator statements. See United States v. Saget, 377 F.3d 223, 228-30 (2d Cir.), supplemented, 108 F. App'x 667 (2d Cir. 2004) (analyzing Bourjaily v. United States, 483 U.S. 171 (1987), identifying as testimonial "a declarant's knowing responses to structured questioning in an

19

investigative environment or in a courtroom setting where the declarant would reasonably expect that his or her responses might be used in later judicial proceedings.").

Third, an opposing party's statement is not hearsay when the statement is offered against an opposing party and is one the party manifested that is adopted or believed to be true. Fed. R. Evid. 801(d)(2)(B). In such cases, the statement is considered an "adoptive admission."

A defendant may implicitly adopt a statement by another party through his failure to object to the statement. United States v. Shulman, 624 F.2d 384, 390 (2d Cir. 1980). When the defendant manifests adoption through silence in response to a statement made by the opposing party, "courts will consider the incriminatory content of the statement in order to determine whether the defendant actually has adopted the statement by his silence. The rationale of such cases is that a person ordinarily will respond to an incriminatory or defamatory statement with a denial, or at least with some indication that he objects to the statement as untrue." Id. at 390; see also United States v. Flecha, 539 F.2d 874 (2d Cir. 1976); United States v. Aponte, 31 F.3d 86 (2d Cir. 1994); United States v. Tyrell, 840 F. App'x 617 (2d Cir. 2021).

Fourth, statements that are not being offered for their truth also are not hearsay. For example, out-of-court statements made by a third party are not hearsay if offered as circumstantial evidence of the defendant's state of mind, rather than for their truth. United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988); United States v. Dunloy, 584 F.2d 6, 11 (2d Cir. 1978). Similarly, questions or commands do not generally constitute hearsay. See United States v. Dominguez-Gabriel, 511 F. App'x 17, 20 (2d Cir. 2013); Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir. 1999); United States v. Bellomo, 176 F.3d 580, 586-87 (2d Cir. 1999). Finally, when a defendant makes statements in the context of a conversation with a third party, the statements of the third party are admissible non-hearsay to the extent that they are necessary to place the defendant's

statements in proper context.  See United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990); United States v. Davis, 890 F.2d 1373 (7th Cir. 1989).

b.     Statements Against Penal Interest – Rule 804(b)(3)

Rule 804(b)(3) of the Federal Rules of Evidence provides for the admissibility of a hearsay statement if the declarant is unavailable and his statement is against his penal interest.  In order to fall within this exception to the rule against hearsay, the statement must be one that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability; and
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).

Admission of such a statement "hinges on whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."  United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007).  "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context" and "[t]hus, this determination must be made on a case-by-case basis."  Id.  A statement against penal interest, when not made to law enforcement, is not considered "testimonial" for Confrontation Clause purposes.  See United States v. Saget, 377 F.3d 223, 224-25 (2d Cir. 2004) (distinguishing Crawford v. Washington, 541 U.S. 36 (2004)).

B.     Discussion

At trial, the government intends to introduce out-of-court statements made by the defendant, his co-conspirators, and murder victim Mark Bajandas that are relevant and either (i) do not constitute hearsay under the Federal Rules of Evidence, or (ii) are admissible as statements

21

against penal interest.  Specifically, among other things, the government intends to introduce the following evidence at trial:[8]

- Statements made by the defendant that were captured on recorded jail calls and BWC videos recorded by police officers who responded to the Gonzalez murder;[9]

- Witness testimony about statements made by the defendant after the Bajandas and Gonzalez murders, admitting his participation in those crimes;

- Witness testimony about statements made by the defendant and other Enterprise members regarding their intentions to murder, assault or otherwise retaliate against members of Bugatti, including Bajandas and Gonzalez, and admissions that they, in fact, made attempts to do so;

- Witness testimony about statements made by the defendant and other Enterprise members regarding their membership in the Enterprise and crimes committed on behalf of the Enterprise;

- Social media posts, photographs, captions and communications demonstrating the relationships and loyalty between members and associates of the Enterprise, as well as participation in unlawful activity or celebration of ill-gotten gains (for example, photographs and captions referencing the Bajandas murder, photographs of firearms and ammunition, references to the Enterprise including references to various Enterprise terms and emojis such as "Made Man" and the diamond or gorilla emoji, use of coded language to reference criminal activity or posts regarding the proceeds of various Enterprise endeavors); and

- Text messages, photographs, cell phone notes and other telephone communications between and with members and associates of the Enterprise evidencing their membership in and association with the Enterprise and related criminal activity, such as fraud and narcotics trafficking, and demonstrating relationships among members and associates of the Enterprise.

- Witness testimony about statements made by Bajandas regarding his own involvement in GSM and Bugatti and his theft of a gun from the defendant.

       These statements are admissible.

---

[8]     The statements outlined herein are representative of those the government intends to introduce at trial as direct evidence; this list is not exhaustive, and the government reserves the right to introduce as evidence statements of a similar nature that are not outlined here.

[9]     Specifically, the defendant's statements are captured on BWC video recorded by Police Officers Christine Christensen, Joseph Everett, Vincent Racioppi, and Michael Randazzo.

1.    <u>Statements Made by the Defendant and His Co-Conspirators</u>

First, many of these statements are direct evidence of the defendant's participation in the murders of Bajandas and Gonzalez.  Indeed, the defendant made numerous admissions— both direct and indirect—claiming responsibility for the murders, including in social media posts and statements to other individuals, including GSM members, and statements made on recorded jail calls.  Moreover, statements made by the defendant and his co-conspirators are relevant, highly probative evidence of, among other things, the existence of the Enterprise; the defendant's and his co-conspirators' association with the Enterprise and each other; the agreed-upon pattern of racketeering activity; and the Enterprise's purposes, including enriching its members, promoting its reputation and protecting the Enterprise.  For example, evidence at trial will include social media posts and communications honoring fallen members (such as "E4BT"—meaning "everything for BT"—or the crown emoji in front of the initials of a fallen member) and posts including various gang references (such as "Apes," "Made Man," "Money Bags,") and emojis representing the gang (such as the diamond, money bag, double M and gorilla emojis).  Additionally, notes applications and other phone content from various GSM members phones includes Enterprise evidence like the gang's code of conduct, oath and gang terminology.  The evidence at trial will show that the defendant and other associates also communicated about, among other things, efforts to seek out and harm gang rivals, including Gonzalez specifically and members of the Bugatti set of UGSN more generally, as well as other criminal conduct, such as gun possession, drug trafficking and fraud, in furtherance of the Enterprise.

Second, all of these statements are either non-hearsay or fall within one or more hearsay exceptions.  As an initial matter, the defendant's own statements constitute classic admissions of a party opponent, admissible pursuant to Rule 801(d) of the Federal Rules of

23

Evidence.  See Fed. R. Evid. 801(d)(2)(A). [10]  And the statements detailed above among Enterprise members, including the defendant and uncharged Enterprise members and associates, constitute co-conspirator statements and, thus, are excluded from the hearsay bar pursuant to Rule 801(d)(2)(E).  At trial, the government will present substantial evidence that the defendant and other declarants were part of GSM, and that the proffered statements—many of which promote the Enterprise or discuss its members' criminal conduct—were made in furtherance of the Enterprise.

Many of these statements are also statements against penal interest and, thus, also admissible pursuant to Rule 804(b)(3).  Indeed, as set forth above, the defendant claimed responsibility for both murders, including in social media posts and in statements made to witnesses expected to testify at trial.  Members and associates of the Enterprise also discussed their involvement the Enterprise's criminal activity, including drug trafficking and the Gonzalez murder.  For example, three hours before the Gonzalez homicide, one of the defendant's co-

---

[10]      The Court should, however, preclude the defendant from offering his own self-serving statements as inadmissible hearsay.  "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."  United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982); United States v. Black, No. 13-CR-316 (DLI), 2014 WL 5783067, at *2 (E.D.N.Y. Nov. 5, 2014) ("[T]he defendant's self-serving, exculpatory statements are inadmissible hearsay . . . .").  In general, a defendant may not "attempt to get his side of the . . . story in front of the jury without himself testifying and opening himself up to cross-examination."  See United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).  This prohibition applies, with limited exception, even where a defendant seeks to offer other parts of the same conversation or message offered by the government.  See United States v. Hill, 658 F. App'x 600, 605 (2d Cir. 2016) (affirming the district court's parsing of a defendant's recorded statement to admit the discrete inculpatory statements and exclude the other self-serving statements that he was "innocent"); United States v. Johnson, 507 F.3d 793 (2d Cir. 2007) (holding that the court properly bifurcated a defendant's post-arrest statement and precluded the defense from introducing a self-serving portion of the statement because "Rule 106 does not render admissible evidence that is otherwise inadmissible"); United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) ("[T]he rule of completeness is 'not a mechanism to bypass hearsay rules for any self-serving testimony.'" (quoting United States v. Gonzalez, 399 F. App'x 641, 645 (2d Cir. 2016))).  In short, should the defendant wish to have the jury hear his version of events, he is free to testify at trial.

conspirators wrote the following in the notes application of his phone: "I'm Posted on Stan, Wit the chop[/] Don't try to spin through[/] Brody letting it flock."  In other words, he wrote that he had been tasked with standing watch ("posted") on Stanley Avenue ("Stan"), armed with a gun ("chop"), and warned the opposition of the danger of driving with firearms ("spin[ning]") through the area, because the defendant's side was about start firing rounds ("letting it flock").[11]

The government anticipates that each declarant would invoke his or her Fifth Amendment privilege against self-incrimination, thus satisfying Rule 804's unavailability requirement.  See, e.g., Fed. R. Evid. 804(a) (noting that declarant "is considered to be unavailable as a witness" pursuant to Rule 804(b)(3) where a privilege applies); United States v. Deluna, 38 F. App'x 644 (2d Cir. 2002) (upholding admission of co-conspirator statement where co-conspirator "was unavailable to testify as he would have invoked his Fifth Amendment privilege against self-incrimination").  And the admissions detailed above—including those related to the defendant's participation in the charged murders—are patently against each declarant's penal interest.

2.   Statements Made by Bajandas

With regard to Bajandas's statements, the government intends to elicit through witness testimony that Bajandas admitted the following: (i) he had stolen a gun that belonged to the defendant; (ii) he was a member of UGSN, including both the GSM and Bugatti "kaves"; and (iii) the defendant asked Bajandas to shoot "Zeus," a rival gang member.  Bajandas clearly satisfies

---

[11]   At trial, the government expects to establish that the co-conspirator was standing across the street from Gonzalez's home waiting for the defendant ("Brody") to come to Stanley Avenue ("Stan") to shoot Gonzalez ("letting it flock") at the time he wrote these lyrics. Accordingly, these statements are also admissible as present sense impressions, as the declarant was "describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Fed. R. Evid. 803(1).  These statements are also admissible as co-conspirator statements given that the defendant is describing conduct completed in furtherance of the Enterprise and that, as described herein, the gang used rap lyrics to promote itself.

the unavailable declarant prong of Rule 804(b)(3), as he is deceased, and sufficient corroborating circumstances for each category of statements will be introduced at trial to establish their trustworthiness. For example, social media posts, text messages, and witness testimony will establish that Bajandas was a member of UGSN. Witness testimony will also corroborate that Bajandas stole a gun from the defendant and was tasked by the defendant to hurt a rival gang member. Finally, the individuals to whom Bajandas made these statements were not associated with GSM, and were in fact individuals with whom Bajandas was close, thus providing another indicia of trustworthiness to the statements and satisfying the admissibility requirements under Rule 804(b)(3). See United States v. Gupta, 747 F.3d 111, 127 (2d Cir. 2014) (One measure to "assess whether a statement against penal interest was sufficiently reliable to satisfy the Confrontation Clause of the Constitution . . . [is if] 'the statement was made to a person whom the declarant believes is an ally.'" (quoting United States v. Saget, 377 F.3d 223, 230 (2d Cir. 2004))).

All of these statements, which are addressed in turn below, are admissible as statements against Bajandas' penal interest under Federal Rule of Evidence 804(b)(3). Furthermore, because Bajandas' statements were against his own penal interest, they can be admitted in their entirety under Rule 804(b)(3), including the portions that also implicate the defendant. A court may not admit statements under Rule 804(b)(3) that are "non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." United States v. Williamson, 512 U.S. 594, 600-01 (1994). "[E]ach particular hearsay statement offered under Rule 804(b)(3) must be parsed and must, itself, be self-inculpatory." United States v. Jackson, 335 F.3d 170, 179 (2d Cir. 2003). However, Williamson also counsels that "there are many circumstances in which Rule 804(b)(3) does allow the admission of statements that inculpate a criminal defendant . . . The question under the Rule is always whether the statement at issue was

26

sufficiently against the declarant's penal interest." Williamson, 512 U.S. at 602; see also id. at 606 (Scalia, J., concurring) ("[A] declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible co-defendant."). All of Bajandas's statements described herein satisfy these caveats because they sufficiently inculpated him, even while also at times inculpating the defendant.

Bajandas's statements that he stole a firearm from the defendant and belonged to gangs are admissible under Rule 804(b)(3) because admitting to stealing and possessing a firearm and belonging to gangs is against one's penal interest. In United States v. Munoz, the Second Circuit affirmed the admission under Rule 804(b)(3) of a declarant's statement that he possessed a gun used in a murder because "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." 765 F. App'x 547, 550 (2d Cir. 2019). Additionally, that statement would "be probative in a trial against [the declarant for possessing a firearm]." Munoz, 765 F. App'x at 550; see also United States v. Whitaker, No. 21-595, 2024 WL 1266348, at *3 (2d Cir. Mar. 26, 2024) (upholding admission of declarant's statement that he "provided a gun for the robbery, which he never got back"). Logically, Bajandas's statement that he possessed a firearm was against his penal interest because he would have known that it was unlawful for him to possess a firearm both under New York State law and—as a felon—under federal law. Thus, because this statement could have exposed Bajandas to criminal liability, there is no reason to doubt its truthfulness, and it should be admitted.

Similarly, Bajandas's admissions that he belonged to a gang not only would have been relevant in a criminal case against him, but also implicated Bajandas in a broader criminal conspiracy—namely, membership in the Enterprise charged herein. Specifically, testimony at trial

will establish that Bajandas stated (i) that he was initially a member of GSM, and later left GSM and joined Bugatti, taking a gun provided by the defendant with him, (ii) that he was an "ape" and would "drag his knuckles" and "beat his chest," in reference to being a gorilla or an ape, which, as will be established as trial, is how members of UGSN refer to themselves, and (iii) that the defendant tasked Bajandas with shooting "Zeus" in order to maintain his (Bajandas's) membership in the gang.

Even if gang membership alone is not illegal, these statements are still admissible as statements against Bajandas's penal interest. First, "the proffered statement 'need not have been sufficient, standing alone, to convict [the declarant] of any crime,' so long as it would have been 'probative' in a criminal case against him." United States v. Gupta, 747 F.3d 111, 127 (2d. Cir. 2014) (quoting Persico, 645 F.3d at 102). In Persico, statements that a co-conspirator made describing that he would meet with Persico, a high-ranking mafia member, in places where they could evade law enforcement surveillance was admitted pursuant to Rule 804(b)(3) because "it would have been probative in a criminal trial to show [the declarant's] membership in the Colombo Crime Family." Persico, 645 F.3d at 102. In a potential prosecution against Bajandas for his gang activity, statements in which he admitted gang membership would clearly be probative for the government's case against him. This is true not only of his discussions of which "kave" he belonged to and his references to gang lingo ("ape," "drag his knuckles," "beat his chest") but also his comments following his defection from GSM that for Bajandas to maintain his membership in GSM, the defendant tasked him with injuring a rival gang member.

Second, statements regarding gang membership in the context of criminal activity that the gang undertakes is against one's penal interest because it implicates the declarant in a criminal conspiracy. In Whitaker, the Second Circuit upheld the admission of statements in which

28

the declarant identified himself as a gang member while discussing how a botched robbery damaged the gang's reputation, because the statements "tended to implicate [the declarant] in a criminal conspiracy." Whitaker, 2024 WL 1266348, at *3. Because Bajandas's statements regarding his gang membership, and violent acts tasked to Bajandas by the defendant, occurred within the context of also discussing the gang's illegal activities, these were against Bajandas's penal interest since he implicated himself in the broader UGSN criminal conspiracy.

III.    Audio Recordings, Music Videos and Written Rap Lyrics Evidencing Membership and Association with the Enterprise and Containing Evidence of the Enterprise's Criminal Activity and the Defendant's Culpability in the Charged Murders Are Admissible

During the course of the racketeering conspiracy and following the defendant's arrest, the defendant, his co-conspirators and members of rival gangs posted various rap videos to social media that describe (i) the Enterprise's criminal activity, (ii) the ongoing rivalry between GSM and Bugatti, and (iii) the defendant's involvement in the Enterprise's criminal activity, including the murders of Mark Bajandas and Francisco Gonzalez. The government seeks to introduce statements made in these songs and music videos by (i) the defendant, (ii) fellow GSM member and co-conspirator Jaheim "Sapa Baby" McKoy, and (iii) Bugatti member Jesus "Young Zuess" Velasquez. It seeks to do so in (i) narrowly tailored portions of one song and (ii) five other complete songs posted to YouTube and Facebook between 2020 and 2023—the time period spanning and directly following the period of the charged offenses. In addition, the government seeks to admit portions of the defendant's written statements, some of which appear to be rap lyrics, that were recovered from the defendant's prison cell in the Metropolitan Detention Center (the "MDC") in November 2022. As described in Section II, above, the government expects to introduce these lyrics through, and after the testimony of, witnesses who will provide foundation for the lyrics' significance, including the existence of the Enterprise, the manner in which the murders were committed and the defendant's participation in the murders in furtherance of the

29

Enterprise.  Accordingly, and as described further below, these statements are admissible because they are not hearsay and because they provide direct and relevant evidence concerning the Enterprise and the crimes charged in the S-2 Indictment.

    A.    <u>Applicable Law</u>

        It is well settled in the Second Circuit that music lyrics are admissible "where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice."  <u>United States v. Pierce</u>, 785 F.3d 832, 841 (2d Cir. 2015).  Indeed, the Second Circuit has routinely approved the admission of music lyrics where, as here, the lyrics establish the existence of, and a defendant's participation in, a charged racketeering enterprise.  <u>See id.</u> at 841 (holding that music videos were properly admitted under Rule 403 where the government "proffered the rap video to show [the defendant's] animosity toward the [rival gang], as well as his association with" the enterprise); <u>see also</u> <u>United States v. Herron</u>, 762 F. App'x 25, 30 (2d. Cir. 2019 (rap videos properly admitted where "used to establish the existence of, and [the defendant's] participation in, the alleged RICO enterprise"); <u>United States v. Barrett</u>, 750 F. App'x 19, 22 (2d. Cir. 2018) (music videos admissible to show association with co-conspirators and use of vehicle used in charged crimes).

        Consistent with Second Circuit law, courts in this District have admitted rap lyrics and music videos evidencing the existence, means and methods of racketeering enterprises.  <u>See</u> <u>United States v. Ayers</u>, No. 20-CR-239 (BMC), 2024 WL 1158686, at *7 (E.D.N.Y. Mar. 18, 2024) (admitting lyrics in a racketeering case where they allude to a specific criminal motive tied to one of the allegations in the case, namely to kill a rival, and excluding lyrics that were too general or amounted to "vapid posturing"); <u>cf.</u> <u>United States v. Jordan</u>, No. 20-CR-305 (LDH), 2024 WL 343970, at *4 (E.D.N.Y. Jan. 30, 2024), (holding that the relevance of rap lyrics as trial

evidence depends on the existence of a specific factual nexus between the content of rap music and the crimes alleged, and excluding generalized rap lyrics in a non-racketeering context).

Rap lyrics and videos are also admissible where they establish the defendant's motive to participate in the charged conduct, Pierce, 785 F.3d at 840-41, or where they contain admissions by the defendant to crimes alleged in the indictment. See also Transcript of Proceedings at 35, United States v. Miller, No. 20-CR-331 (LDH) (E.D.N.Y. May 7, 2024) (attached hereto as Exhibit A) (noting that "simply putting what is tantamount to a confession to a beat doesn't make it inadmissible" and later admitting rap lyric evidence with a factual nexus to the allegations of the charged crimes).

B.    Discussion

The government seeks to admit the below categories of statements made by the defendant, McKoy[12] and Velasquez, which are further detailed in Exhibit B, attached hereto:[13]

- Statements made by the defendant or co-conspirator McKoy discussing the existence of the Enterprise (which is referred to by its members, who refer to themselves as "apes" and "gorillaz," as the "mafia" and those affiliated with the Enterprise, including the defendant and other GSM members such as "Birdie" and "Nas"). See, e.g., Ex. B at Index 5 (McKoy statement in the song "Like That," "with the mafia like 808 / my n****s leave you DOA / Birdie got the glizzy, he won't hesitate . . . Nas hound, trigger finger itching tryna leave a n***a"); id. at Index 1 (the defendant's statement in "The Story of Tragedy pt. 1," "13, GSM he started bangin' his set / took his Blood sh*t serious . . . if life's a jungle, we the ape, he started bangin' his chest"); and id. at Index 4 (the defendant's statement "We glorify killers & jack boyz / It's only gorillaz & hat boys a kouple of trends").

---

[12]    As described in Section II above, statements of the defendant and his co-conspirators are admissible as non-hearsay. As a fellow member of GSM during the charged time period, McKoy was a co-conspirator to the conspiracy alleged in the S-2 Indictment.

[13]    The government attaches draft transcript excerpts of writings recovered from the defendant in Exhibit C and the various videos as Exhibit D. The government has narrowly tailored its request, and the statements the government seeks to admit come from just a portion of an enormous volume of songs written by the defendant and videos and songs written or performed by the defendant, McKoy and Velasquez.

- Statements made by the defendant or McKoy concerning GSM's rivalries and acts of violence that took place on both sides of the GSM and Bugatti beef, including the murders of Avanti Brock ("BT") and David Pena ("Davi"). See, e.g., Ex. B at Index 5 (McKoy statement in the song "Like That," "Rest in peace BT and Davi / for them its lit / sleep in peace / for my soldiers, for my guys I do the hit"); id. at Index 3 (the defendant's statement "been spendin' them op blocks, what / watch me hit every last one of these n****s . . . yo homie died, it hurts your pride but its still f*ck that n***a . . . boy that's a dead man, all that blood he swimmin' around and we call him redman . . . look what they started catch me an opp and I'll flock at the target"); and id. at Index 4 (written statements recovered from the defendant's prison cell "Forevr shipping diamondz in the ruff / RIP 2 BT long live Robo jus").

- Statements made by the defendant concerning his involvement in the charged conduct, including the specific way in which the defendant murdered both Mark Bajandas and Francisco Gonzalez. See, e.g., Ex. B at Index 2 (the defendant's statements in the song "Revenge is Glorious," "That boy got rocked, he was tryna play a middle man / ain't squashing shit my homie died for his affiliation . . . he saw the flash, heard a bang, and then his body dropped / see all that switchin' all that dissin, that's what got him whacked . . . ain't learned from his homie, did that sh*t right to his self / tag his toe at the morgue put him on a shelf / I eat for real shoot to kill, them n****s think I'm playin' / he on the ground he can't get up, you would think he plankin' / we checked him out, released his bowels, how you leave him stinkin' / left his brains on them sheets man what was he thinkin'?"); and id. at Index 4 (written statements recovered from the defendant's prison cell "Kuz I Turn all my oops into ghost / Francisco I mix them N / Mark / A … shhh / Gotta chill … they don't Know / Lately how I feel / Like the reaper / If I spot em I'm snatching his soul").

- Statements made by Bugatti gang member Jesus Velasquez concerning the rivalry between GSM and Bugatti and insults made about John Pena on "diss tracks"[14] posted to YouTube by Velasquez. See, e.g., Ex. B at Index 6 (Velasquez's statements in "Why You Lie For," "you can't get back them n****s you lost," "Tell me who you shot n****a [not] . . . who you shot on the rock"); id. at Index 7 (Velasquez's statements in "Missing You," "every opp we take, I'll be missing you"); and id. (Velasquez's statements in "Missing You," "but throw up that M, either way that shit get dropped . . . why the fuck do you think that we Most Hated, ask around, cuz we did a lot").

For the reasons described below, each of the above-described categories of statements, including the proffered statements by the defendant, McKoy and Velasquez and the accompanying video clips (where applicable), are admissible at trial.

---

[14]   A "diss track" is a song intended to show disrespect to someone else, which is often the result of an ongoing feud.

First, statements about GSM as an organization, its members, and the defendant's affiliation with GSM are plainly admissible to show the existence of the Enterprise and the association of its members with one another.  At trial, the government must prove, among other things, the existence and nature of the Enterprise, including that the gang made efforts to "promot[e] and enhanc[e] the prestige, reputation and position of the Enterprise with respect to rival criminal organizations," that members of the Enterprise "committed, attempted to commit, agreed to commit and threatened to commit acts of violence" and that the defendant was a member of the Enterprise and murdered Mark Bajandas "for the purpose of maintaining and increasing [his] position in" GSM.  S-2 Indictment ¶¶ 4(a), 5(a), 6, 17.  Here, the proffered lyrics from "Like That" specifically describe members of GSM engaging in violent conduct, including members "Birdie" and "Nas," and the music video depicts various GSM members, including Harold "Henny" Hansen and Sefu "Blakka" Luthman, among others, associating with one another while, among other things, displaying hand gestures associated with GSM.  In addition, the defendant's statements establish the defendant's affiliation with GSM from a young age ("13, GSM he started bangin' his set") and detail how the gang promotes those who engage in violence with statements such as "[w]e glorify killers & jack boyz / It's only gorillaz & hat boys a kouple of trends."  See Ex. B at Index 4; see also S-2 Indictment ¶ 5(a).  As the above-referenced lyrics and videos specifically describe the Enterprise and demonstrate that murders such as the charged murder increase a member's standing in the Enterprise, they are admissible.

Second, the government expects one or more witnesses to testify about the deaths of David "Davy" Pena and Avanti "BT" Brock, which fueled GSM's rivalry with Bugatti, a separate "kave" of Gorilla Stone Nation based in Mariner's Harbor, in the months before Bajandas' death in 2021.  Through witness testimony, the government expects to establish that, among other

things, McKoy's lyrics in "Like That" ("[r]est in peace BT and Davy / for them its lit") referred the expectation that GSM members would retaliate against Bugatti in response to the David Pena and Brock murders.  McKoy's statements, along with the defendant's numerous statements referring to acts of violence against "opps," or opposition, see, e.g. Ex. C at 1; Ex. D-4, are direct evidence that GSM members and associates "used and threatened to use physical violence against . . . members of rival criminal organizations" and that the defendant murdered Bajandas "for the purpose of maintaining and increasing [his] position in" GSM.  See S-2 Indictment ¶¶ 5(c), 17.

Third, statements by the defendant containing admissions that he murdered Mark Bajandas and Francisco Gonzalez are direct evidence of the crimes alleged in the S-2 Indictment. See S-2 Indictment ¶¶ 12, 13.  Specifically, lyrics from "Revenge is Glorious"—a YouTube video released on the defendant's YouTube channel in 2023, during his incarceration—describe the defendant's participation in murders that closely resemble the murders charged in the S-2 Indictment.  The government expects that trial evidence will establish that Mark Bajandas was shot in the street after defecting from GSM and joining the rival Bugatti gang; in "Revenge is Glorious," the defendant raps that "[t]hat boy got rocked, he was tryna play a middle man / ain't squashing shit my homie died for his affiliation . . . he saw the flash, heard a bang, and then his body dropped."  Ex. B at Index 2 (emphases added).  The government expects to establish at trial (i) that the defendant was upset at Bajandas for switching alliances from GSM to Bugatti ("play a middle man") and was unwilling to forgive Bajandas for defecting on GSM ("ain't squashing shit"); (ii) that BT and Davy, who the defendant was close with, were killed by Bugatti gang members because of their membership in GSM ("my homie died for his affiliation"); and that the defendant approached Bajandas from the front and shot him in a direct confrontation because of that defection, resulting in Bajandas dropping to the ground ("he saw the flash, heard a bang, and

then his body dropped").  The government further expects that trial evidence will establish that Francisco Gonzalez was shot in the head while sleeping, which the defendant also describes in "Revenge is Glorious," when he raps "left his brains on them sheets man what was he thinkin'?" Id. at Index 2 (emphasis added).  Additionally, in written lyrics recovered from the defendant's prison cell, the defendant more directly admitted to both the Bajandas and Gonzalez murders, writing "Kuz I Turn all my opps into ghost / Francisco I mix them N / Mark / A … shhh / Gotta chill . . . they don't Know / Lately how I feel / Like the reaper / If I spot em I'm snatching his soul."  Id. at Index 4 (emphases added).

Finally, statements made by Jesus Velasquez are admissible.  The government expects one or more witnesses to testify that "Why You Lie For," by Jesus Velasquez, was a diss track written about the defendant in June 2020, prior to Mark Bajandas' murder.  Specifically, the government expects to establish that Velasquez was a member of Bugatti and that (i) the lyrics in the song were written to taunt and criticize the defendant for not responding to the murders of David Pena and Avanti Brock, (ii) certain images in the music video were intended to disrespect GSM and (iii) the defendant viewed, and was angered by, the music video, which further fueled the GSM and Bugatti beef.  Accordingly, the music video further establishes the defendant's motive to retaliate against Bugatti in the months leading up to Bajandas' murder.

"Why You Lie For" and another music video by Velasquez, "Missing You," are both admissible for a non-hearsay purpose since both videos demonstrate the existence of GSM's rival gang—Bugatti—including Velasquez, with whom witness testimony will establish the defendant had a particular "beef."  The "Why You Lie For" music video features a number of Bugatti members and associates, including Velasquez and Bajandas, congregating while

displaying firearms[15] and gesturing as if they are pulling a gun's trigger.   The music video is, therefore, evidence of the existence of the Bugatti enterprise, the violent nature of the enterprise and its rivalry with GSM, particularly in light of the context of the song's lyrics being intended to show disrespect to the defendant.

The "Missing You" music video, which was released in 2022, evidences the ongoing feud between GSM and Bugatti, both at the time of Bajandas' murder, and in the year following the murder.  In the music video, which is styled as a tribute to Bajandas, Velasquez (a member of Bugatti) is seen making UGSN hand-signs, signifying his gang membership, and double "M" hand gestures—commonly associated with GSM.[16]  Further, this music video, along with "Why You Lie For," is also admissible to corroborate witness testimony about the existence of the ongoing feud between GSM and Bugatti.  In the video, Velasquez raps about the Bugatti enterprise and its rivalry with GSM ("but throw up that M, either way that shit get dropped . . . why the fuck do you think that we Most Hated, ask around, cuz we did a lot"), and that acts of violence against members of opposition gangs are done in Bajandas's honor ("every opp we take, I'll be missing you").  See Ex. B at Index 7.  This evidence is also admissible to establish the existence of, and explain, the relationships between the numerous participants involved in the back-and-forth retaliation between Bugatti and GSM.

---

[15]     The government expects at least one witness to testify that the weapons brandished in "Why You Lie For" were real firearms.

[16]     The government expects to establish through witness testimony that Velasquez, a prominent member of GSM's rival gang Bugatti, was displaying GSM's hand gestures as a sign of disrespect.

36

IV.   911 Calls, Body Worn Camera Footage, and Bajandas's Statements Regarding a Dispute with the Defendant Should Be Admitted as Hearsay Exceptions

In connection with the defendant's murder of both Bajandas and Gonzalez, the government further moves for admission at trial of (i) one 911 call placed immediately after the defendant shot Bajandas, (ii) BWC video from the first responder to the scene of the Bajandas shooting, (iii) two 911 calls in the immediate aftermath of the Gonzalez murder, (iv) BWC videos recorded by police officers who responded to the Gonzalez murder, and (v) Bajandas's statements four months before his murder regarding a dispute between the defendant and himself. All of these statements are highly probative of the charged conduct and are admissible as present sense impressions under Rule 803(1) and excited utterances under Rule 803(2).[17]

A.   Applicable Law

1.   Present Sense Impressions

Rule 803(1) of the Federal Rules of Evidence provides an exception to the general rule against hearsay for any statement "describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question." United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994). Because "in many, if not most, instances precise contemporaneity is not possible, . . . a slight lapse is allowable between the event perceived

---

[17]    The parties have agreed to stipulate to the authenticity of the 911 calls and jail calls to avoid the need to call custodial witnesses. In any event, both the 911 calls and jail calls would be admissible as business records under Rule 803(6) of the Federal Rules of Evidence. The government will admit the BWC footage through various NYPD officers who were present at the time the videos were recorded and can testify to their authenticity.

and the declarant's statement." Id. "[T]here is no per se rule indicating what time interval is too long." Id.

The reason for this exception is twofold. First, the immediacy requirement reduces the opportunity for reflection, and thus minimizes the likelihood of deception or fabrication on the part of the declarant. Second, immediacy also reduces the likelihood that the declarant will have inaccurately remembered the event in question. See United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002) ("Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory.").

## 2. Excited Utterances

Rule 803(2) of the Federal Rules of Evidence provides another exception to the rule against hearsay for excited utterances. An excited utterance is a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). To qualify as an excited utterance, the proponent of an out-of-court statement must establish the following: i) that a startling event occurred; ii) that the declarant made the statement while under the stress of the excitement caused by the startling event; and iii) that the declarant's statement relates to the startling event. See United States v. Brown, 254 F.3d 454, 458 (2d Cir. 2001).

"The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability. An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)." United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998).

B.      Discussion[18]

As discussed in more detail below, the government intends to admit (i) one 911 call and BWC video from the immediate aftermath of the Bajandas murder, (ii) statements of an individual ("Caller-2") in the immediate aftermath of the Gonzalez murder which were captured in a 911 call and on BWC video, (iii) statements of an individual ("Caller-3") in the immediate aftermath of the Gonzalez murder which were captured in a 911 call and on BWC video, and (iv) Bajandas's statements four months before his murder regarding a dispute that existed between the defendant and himself.  All of these statements are highly probative of the charged conduct and are admissible as exceptions to the rule against hearsay.

1.      911 Calls and Body Worn Camera Related to the Bajandas Murder

The government intends to admit a 911 call made in connection with the defendant's murder of Mark Bajandas.  As detailed on the call, the caller ("Caller-1") saw the incident from his residence located near where the shooting occurred.  Caller-1 recounted, in sum and substance, the following: someone had just been shot multiple times; the shooting occurred less than a minute before Caller-1 placed the call; the shooter was wearing a blue jacket and black pants; the shooter, the victim, and two others were all Black; multiple people ran from the scene after the shooting; the direction in which the shooter fled; and police were responding to the scene.

Caller-1's statements are classic present sense impressions of a declarant explaining an event that the declarant perceived and that had just transpired—that Bajandas had just been shot and that the shooter and his co-conspirators fled immediately after the shooting.  During the call itself, Caller-1 is live-narrating the events as they unfold—informing emergency medical services ("EMS") that "the cops are here" and that they "just got off" and the officers were "giving

---

[18]      The transcripts of each 911 call are attached as exhibits E, F and G.  The 911 call recordings and BWC videos can be made available at the Court's request via USAfx.

[Bajandas] chest compressions now."  This call's contents thus satisfy the three elements of the present sense impression requirement: the statement describes the event that the declarant had just perceived, the declarant perceived the event being described, and the description, which was given less than a minute after witnessing the shooting, was "substantially contemporaneous" with the event.  Mejia-Valez, 855 F. Supp. at 613.  Caller-1's statements were straightforward, clear, and made in close proximity to the events in question, and there is no indication the statements were deceptive or calculated for an ulterior purpose.  Rather, this was a call to summon help and provide details relating to a crime that occurred less than a minute earlier.  See Jones, 299 F.3d at 112.

Furthermore, the call is also admissible as an excited utterance under Rule 803(2).  First, a startling event had occurred—the shooting of an individual in close proximity to Caller-1's residence.  Second, Caller-1 was under the stress of that traumatic event during the call: Caller-1 mentioned that the victim "is dying" and that the whole event was "fucking crazy" and "sick."  Third, Caller-1's statements relate to the startling event, as Caller-1 described the shooting itself during the call.  Accordingly, the calls satisfy all three elements for admission of the statements as excited utterances.  See Brown, 254 F.3d at 458.

The government also seeks to admit the BWC video of Police Officer Vincent Larosa, who responded to the scene and rendered aid to Bajandas.  The video shows Bajandas lying on the ground with blood near him, moaning and unresponsive, and shows the officer beginning to perform chest compressions.  Officer Larosa can be heard asking for help from and giving instructions to another officer, asking Bajandas if Bajandas can hear him, and commenting on Bajandas's condition, saying, "He's still breathing," "Chest, arms," "He's losing it."  Some of these statements, such as the requests and instructions to other officers, will not be offered for their truth.  The statements regarding Bajandas's condition should be admitted as present sense

impressions, as Officer Larosa is shown describing the things he was observing while they were taking place, i.e., announcing Bajandas's condition while he perceived it.   These statements are plainly admissible as present sense impressions as Officer Larosa is narrating the events contemporaneously to their occurrence.

Finally, all of the statements in both the 911 call and the BWC video are highly probative and not unduly prejudicial.   First, the conduct reported in the call made by Caller-1 is evidence of the charged Bajandas homicide.   Caller-1 described perceiving the murder unfold, from the first sound of the fired bullets to the NYPD officers responding to the scene.   The call provides corroboration of anticipated witness testimony and physical and photographic evidence. Additionally, Caller-1's perception that someone was "laughing at [the victim]" as he died will corroborate other evidence of the animosity the defendant felt toward Bajandas at the time of the murder, including text messages and social media evidence demonstrating the existence of a gang-related dispute between the defendant and Bajandas.   Second, the BWC footage is probative because it tends to prove that Bajandas was in fact shot to death next to the basketball court, despite the absence of surveillance video showing the shooting itself.   Specifically, the BWC video shows Bajandas lying alone in the walkway near the basketball court, corroborating that he was in fact shot in that location and that the defendant and his co-conspirators quickly and immediately fled the scene of the shooting.   And although the BWC video, unlike the surveillance video, makes clear that Bajandas had suffered gunshot wounds (including via Officer Larosa's statements ("Chest, arms") and the presence of some visible blood), it does not include excessively graphic images of his injuries, because his clothing covered the majority of his injuries during the video. Accordingly, all of these statements should be admitted.

2.    Statements Made by Caller-2

The government seeks to admit statements made on a 911 call and BWC video by an individual ("Caller-2") who was in the room with Francisco Gonzalez during his murder by the defendant.[19]  These statements are admissible as present sense impressions and excited utterances.

During a 911 call placed minutes after the murder, Caller-2 informed EMS of the shooting's location and repeatedly begged for someone to hurry to help Gonzalez.   The BWC footage, which begins roughly ten minutes later, within the time frame that courts have allowed for present sense impressions, records Caller-2 describing the murder she had just witnessed and explaining her movements in the minutes afterward.

The call placed by Caller-2 is admissible as both an excited utterance and present sense impression.  In the first instance, it is an understatement to say that lying next to someone as he is shot to death is a startling event.  Caller-2's alarmed tone of voice and frequent entreaties for immediate help indicate that she remained under that stress at the time of the 911 call.  Finally, the statements relate to that event.  Accordingly, Caller-2's 911 call satisfies the three elements for admission of the statements as excited utterances.  See Brown, 254 F.3d at 458.

This call is also admissible as a present sense impression because it occurred so soon after the shooting that Caller-2 believed there may still be time for EMTs respond to the scene and save Gonzalez and also that the attacker may still be present in the house.  Since Caller-2's description of the event was "substantially contemporaneous" with the event in question, it is

---

[19]    Specifically, statements made by Caller-2 are captured on BWC videos recorded by Police Officers Francesca Garda, James Giovansanti, Andrew Hoydal, Chungkong Ip, Anza Kaleem, Robert Leibowitz, Anthony Limoncelli, Joseph Maresca, Peter Masullo, Fiona O'Neill, John Pedersen, Kevin Robinson, Philip Sarnicola, John Tepedino, and Christopher Serio.

Caller-2 is the same individual referred to above as "Individual-1."  Because she called 911 about the Gonzalez murder, she is referred to in this section as "Caller-2" for clarity.

admissible as a present sense impression.  See Mejia-Valez, 855 F. Supp. at 613.  The government anticipates that the testimony at trial will establish that it was because of the Caller-2's 911 call that law enforcement and medical personnel responded to the scene.  Caller-2's statements are straightforward and clear, made in close proximity to the events in question and there is no indicia the statements were calculated for an ulterior purpose or deceptive.  Rather, these were routine 911 calls summoning help.  See Jones, 299 F.3d at 112.  Further, Caller-2's clear feelings of anguish and her repeated pleas for medical assistance indicate that she was not involved in the murder and that her statements were not manufactured to deceive, but rather were intended to provide accurate information so that EMTs could aid the victim of the shooting she had just witnessed.

Caller-2's statements to the responding officers captured on BWC video are admissible for similar reasons.  These statements are admissible as excited utterances because the videos show that Caller-2 was wailing, crying, and still extremely distraught from witnessing the murder.  Her distress continued for the duration of the footage, lasting at least 45 minutes after the murder, as evidenced by her "body language and expressions . . . show[ing] her being under the stress of the incident."  United States v. Spencer, No. 22-1464-CR, 2023 WL 5091827, at *2 (2d Cir. Aug. 9, 2023), cert. denied, 144 S. Ct. 594, 217 L. Ed. 2d 317 (2024) (upholding admission of excited utterances made after commercial robbery where declarant described herself as "shooken up" [sic] and her "body language in the video demonstrate[d] that she remained under the stress of the event.").  Caller-2's statements were sufficiently contemporaneous and made under the extreme stress of witnessing a murder, making her statements in the BWC footage admissible both as present sense impressions and excited utterances.  And in addition to providing a narrative of the murder—detail which was not captured on the 911 call—Caller-2's statements and demeanor as shown in the BWC videos also rebut a potential defense that she herself was the

shooter. Her behavior—crying and wailing—are consistent with a witness to an unexpected horrifying tragedy, not a perpetrator of a murder, and this behavior is not evident from the 911 call alone. Therefore, the BWC videos are not cumulative and are important evidence detailing the events that took place and contradicting any argument that Caller-2 was involved in the murder.

3.    Statements Made by Caller-3

The second 911 call related to the Gonzalez homicide that the government intends to admit was made by a man ("Caller-3") who saw his dogs bite an individual, who the evidence will prove was the defendant, as that individual ran through a backyard across the street from the house where the defendant had just murdered Gonzalez. Approximately 15 minutes after the incident in the backyard, after noticing the emergency response nearby—which, as shown on BWC videos, involved multiple police cars, numerous officers, an ambulance, and Caller-2 wailing loudly on a street that had recently been quiet—Caller-3 called 911.

As shown in the BWC footage, Caller-3 was standing next to a tent in the backyard that he used as his living space and repeated some of the information he had provided in the 911 call: that someone (the defendant) had ran through his backyard and that Caller-3's dogs bit him as he did so. In the BWC footage Caller-3 provided police officers with additional detail, including by pointing them in the direction in which the defendant fled.

The 911 call made by Caller-3 is admissible as an excited utterance. The startling event witnessed by Caller-3 was seeing his dogs attack an intruder (the defendant) as he ran through the backyard where Caller-3 was located. Caller-3's tone of voice indicated that he was still surprised by the commotion, emphasizing that such an intrusion had "never happened before." The call's content recounted the startling event and described what the intruder's clothing had looked like ("all black"). These factors satisfy the three elements for admission of the statements as excited utterances. See Brown, 254 F.3d at 458.

44

Caller-3's call is also admissible as a present sense impression because Caller-3 narrated events that he witnessed just 15 minutes before calling. The passage of this amount of time between witnessing the intruder and placing the call does not make the call inadmissible. Courts in this district and elsewhere have admitted 911 calls as present sense impressions despite a time lapse comparable to the 15 minutes at issue in this call. See, e.g., Mejia-Valez, 855 F. Supp. at 613 (admitting 911 call placed 18 minutes after murder); United States v. Blakey, 607 F.2d 779, 785-86 (7th Cir. 1979) (upholding admission of statements made "between several minutes and 23 minutes after" the event being described); United States v. Obayagbona, 627 F. Supp. 329 (E.D.N.Y. 1985) (Weinstein, J.) (admitting as excited utterance and present sense impression a statement made 14 minutes and 25 seconds after the event being described).

Caller-3's statements to police officers on BWC video should also be admitted because they are present sense impressions and excited utterances.[20] These statements all qualify as present sense impressions because Caller-3 described events that he had perceived, and the time that had elapsed from the event described to the statements (approximately 15 minutes) is sufficiently contemporaneous to fall within the present sense impression exception. The fact that these statements are "consistent with his first call and with the other testimony in the case" further supports that they should be admitted as present sense impressions. Mejia-Velez, 855 F. Supp. at 614 (citing United States v. Parker, 936 F.2d 950, 954 (7th Cir. 1991)) (noting that admissions of statements under Rule 803(1) can be "buttressed by their intrinsic reliability") (alteration omitted).

The statements also qualify as excited utterances because the videos show that Caller-3, who shouted when the police arrived and asked them not to shoot his dogs, continued to

---

[20]     Specifically, statements made by Caller-3 are captured on BWC videos recorded by Police Officers Anza Kaleem, Joseph Maresca, John Ruiz, and John Tepedino.

be under the stress and excitement of the defendant's intrusion into the backyard and seeing him be attacked by the dogs.  Furthermore, in addition to reacting to the initial excitement caused by the defendant intruding into the backyard, on the BWC videos Caller-3 is also reacting to the "startling event" posed by the arrival of emergency responders in the area, which, in addition to the surge of activity described above, also involved four armed police officers with flashlights entering the backyard that was his home.

The statements made by Caller-2 and Caller-3, in both the 911 calls and the BWC footage, are highly probative and not unduly prejudicial.  Caller-2's statements were an eyewitness account of a murder the defendant is charged with committing and Caller-3's statements were an eyewitness account of his flight from the scene of the murder and his injury via dog bite.  Notably, when the defendant was apprehended in the vicinity of the backyard later that morning, he complained of wounds from being bitten by a dog (which were visible).  Statements by both individuals relate to the Gonzalez homicide are thus crucial evidence that describe the murder and place the defendant near the scene shortly thereafter.  The statements also corroborate additional testimony and evidence that the government expects to present at trial, including video footage showing the defendant leaving the building where he killed Gonzalez and heading in the direction of the backyard where Caller-3 was located, as well as testimony, video footage, and photographs showing his injuries from the dog attack.  Thus, these statements should also be admitted.

4.      <u>Excited Utterances by Bajandas Regarding the Existence of a Dispute with the Defendant</u>

The government also seeks to admit statements made by Bajandas to "Individual-2" in approximately November 2020, about four months before he was murdered.  Individual-2 is expected to testify that while she was driving Bajandas to a location in the Bronx, Bajandas looked out the car's window near a bodega where a group of people were gathered outside.  Bajandas

46

immediately became nervous, placing his head down and his hood over his head.  In a fast and shaky voice, Bajandas told Individual-2 to drive faster and explained that he had "beef" with the defendant and the group of individuals congregating outside the bodega were associated with the defendant.  When Individual-2 and Bajandas arrived at their destination, Bajandas went into the location quickly and, once inside, continued to look nervously out the window.  Approximately 15 minutes later, Bajandas repeated that the people he had seen were associated with the defendant, with whom he had "beef," and expressed concern for his safety.

These statements are admissible as excited utterances.  A startling event had occurred—Bajandas had seen people affiliated with the defendant, a violent gang member with whom Bajandas had "beef."  Bajandas was under the stress of seeing those individuals when he made the statements, as demonstrated by his fast and shaky voice, his efforts to conceal his face so they would not see him, and the fact that he continued looking out the window once he had arrived at his destination.  The statements, which were about the affiliation of the individuals Bajandas had seen and the reason he was afraid of them, related to the startling event.  As such the statements are admissible as excited utterances.  See Brown, 254 F.3d at 458.

Finally, the statements are highly probative, as they corroborate the fact that Bajandas and the defendant had a "beef"—namely, the dispute over Bajandas's defection to a rival gang and that Bajandas believed the defendant was willing to use violence against him as a result. The statements create no risk of undue prejudice because the statements go no further than simply identifying the dispute and the association between the defendant and the individuals Bajandas had seen.  These statements to Individual-2 should be admitted.[21]

---

[21]     In addition to being admissible as excited utterances, Bajandas's statements that he had "beef" with the defendant and needed to get away quickly from individuals associated with the defendant are also admissible as statements against his own penal interest, as described above.

47

V.     If Defendant Testifies, He May Be Cross Examined on His Criminal History

If the defendant testifies, the government intends to cross-examine him about certain of his prior felony convictions.  The defendant's prior felony convictions are as follows:

- On July 1, 2009, the defendant was convicted of Attempted Robbery in the Second Degree (Displaying What Appeared to Be a Firearm), in violation of N.Y.P.L. § 160.10, a felony for which he was sentenced to three years in prison with two years of supervised release, and Assault in the Second Degree (Intent to Cause Physical Injury with a Weapon/Instrument) in violation of N.Y.P.L. § 120.05, a felony for which he was sentenced to a one-year order of protection. He was released from incarceration on June 22, 2011.

- On July 3, 2013, the defendant was convicted of Attempted Assault in the Second Degree (Intent to Cause Physical Injury with a Weapon/Instrument), in violation of N.Y.P.L. § 120.05, a felony for which he was sentenced to two to four years in prison. He was released from incarceration on September 16, 2016.

- On June 15, 2017, the defendant was convicted of Attempted Robbery in the Second Degree (Aided by Another), in violation of N.Y.P.L. § 160.10, a felony for which he was sentenced to a five year order of protection and five years of supervised release. The plea stemmed from the defendant's arrest in July 2011, one month after he was released from prison following his conviction on the 2009 offenses.

Should the defendant testify, the government would seek to introduce evidence of each of the above-described convictions during cross-examination.

A.     Applicable Law

Federal Rule of Evidence 609 governs the admissibility of evidence of prior convictions for impeachment purposes.  As relevant here, if the witness is a criminal defendant,

---

Additionally, they are admissible under Rule 803(3), which provides that regardless of the out-of-court declarant's availability, a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" does not constitute hearsay.  Fed. R. Evid. 803(3).  Here, Bajandas's statements regarding the existence of the dispute and his need to flee the individuals associated with the defendant are admissible to prove Bajandas's state of mind at the time he made those statements—specifically, that he was in fear of the defendant.  Evidence of Bajandas's fear of the defendant is relevant because it corroborates text messages in which Bajandas—knowing that the defendant was at the Avanti Brock memorial where the Bajandas murder ultimately took place—expressed hesitation about attending the memorial himself.

evidence of a prior felony conviction is admissible "if the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B). Under Rule 609(a)(1), the "evidence" of prior convictions that may be admitted includes "the essential facts of a witness's convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed." United States v. Estrada, 430 F.3d 606, 615 (2d Cir. 2005); see also United States v. Brown, 606 F. Supp. 2d 306, 315-16 (E.D.N.Y. 2009) (same).

In weighing the probative versus prejudicial value of impeaching a defendant with a prior conviction, courts generally consider five factors: (1) the impeachment value of the prior crimes; (2) the dates of the convictions and the defendant's subsequent history; (3) the degree of similarity between the past crimes and the charged crime, with dissimilarity favoring admission; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue. See United States v. Hayes, 553 F.2d 824, 828 (2d Cir. 1977); see also United States v. Jimenez, 214 F.3d 1095, 1098 (9th Cir. 2000); United States v. Smith, 131 F.3d 685, 687 (7th Cir. 1997); United States v. Sloman, 909 F.2d 176, 181 (6th Cir. 1990); Jones v. City of New York, No. 98 Civ. 6493 (LBS), 2002 WL 207008, at *2 (S.D.N.Y. Feb. 11, 2002).

If the later of a conviction or the date of the defendant's release from confinement for that conviction is more than ten years old, then, pursuant to Rule 609(b), evidence of the conviction is admissible only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect" and the party seeking to offer it gives the opposing party reasonable written notice of its intent to use the evidence. Courts apply the same balancing test as that prescribed by Rule 609(a), but the heightened standard of Rule 609(b) requires that the evidence have more probative value than that required under Rule 609(a). See Brown, 606 F. Supp. 2d at 313. In addition, under Rule 609(b), a court must "make an on-the-record finding

49

based on specific facts and circumstances that the probative value of the evidence substantially outweighs the danger of unfair prejudice." Jones v. N.Y. City Health & Hosps. Corp., 102 F. App'x 223, 226 (2d Cir. 2004) (summary order); see also United States v. Payton, 159 F.3d 49, 57-58 (2d Cir. 1998) (upholding district court's decision to admit defense witness's 13-year-old convictions where court specifically found that witness's "credibility was 'crucial' because she would be testifying in direct contradiction to the government's witnesses on the key element of possession of the .38 caliber revolver; the impeachment value of her convictions was substantial; and the government provided defendant with sufficient advance notice of its intent to use these convictions in her cross-examination").

B.    Discussion

Should the defendant testify, the government expects that he will generally deny the charges against him, namely his involvement and role in the charged Enterprise, the murder of Mark Bajandas, and the murder of Francisco Gonzalez. If so, such testimony would contradict, among other things, the testimony of the government's witnesses. This would squarely place before the jury the issue of the testifying defendant's credibility versus that of the government's witnesses and other evidence, thereby increasing the need to impeach the defendant using his prior convictions. Indeed, a defendant places his credibility directly at issue whenever he testifies and denies having committed the charged offense. See United States v. Alexander, 48 F.3d 1477 (9th Cir. 1995). Thus, regardless of the substance of the defendant's testimony, once he places his version of the events before the jury, his credibility becomes central to the jury's determination of the case. To permit the defendant to take the stand and appear "pristine" would be "unfair and misleading to the jury." United States v. Ortiz, 553 F.2d 782, 785 (2d Cir. 1977).

Here, the government should be permitted to introduce evidence of the defendant's four prior felony convictions described above during cross-examination should the defendant

50

testify at trial.  Each of the five factors weigh in favor of permitting inquiry on each of these convictions.  With respect to the first factor, the impeachment value of the prior crime, "Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully."  Estrada, 430 F.3d at 617.  Moreover, "as the Second Circuit has recognized, 'the gravity of an offense may bear on truthfulness, to the extent that more serious offenses indicate a stronger willingness to ignore the law.'"  United States v. White, No. 08-CR-682 (NGG), 2009 WL 4730234, at *4 (E.D.N.Y. Dec. 4, 2009) (quoting Estrada, 430 F.3d at 618).  Each of the defendant's prior convictions is a serious violent felony offense—one of which includes the use of a firearm—indicating the defendant's fundamental refusal to abide by the rules.

The second factor, the dates of the convictions and the defendant's subsequent history, also ultimately weighs in favor of admission.  First, the defendant's 2017 conviction for attempted robbery in the second degree and his 2013 conviction for attempted assault in the second degree each occurred within ten years of the conduct charged here.  See Fed. R. Evid. 609(a)(1). Further, while the defendant's 2009 convictions for attempted robbery in the second degree and assault in the second degree are over ten years old, the 2009 offenses involved conduct (attempted robbery and assault) similar to his subsequent convictions in 2017 and 2013, each of which related to conduct that occurred only months after he was released from prison for his 2009 offenses. Moreover, the defendant was incarcerated for approximately five of the years since his conviction for the 2009 offenses.  See United States v. Thomas, 214 F. Supp. 3d 187, 196 (E.D.N.Y. 2016) (admitting evidence of defendant's past convictions where, although convictions occurred over ten years prior, defendant's sentence of imprisonment ended two years prior and he was convicted twice following his release); see also United States v. Bumagin, 136 F. Supp. 3d 361, 376 (E.D.N.Y. 2015) (admitting evidence of conviction over ten years old pursuant to Rule 609(b)

where defendant was released from sentence of imprisonment relating to 1999 conviction and was re-arrested in 2002 for similar conduct, finding that the defendant's "subsequent history [did] not suggest that [the defendant had] abandoned his earlier ways[,] but rather suggest[ed] he quickly fell back into criminal conduct.") (omitting internal citations and quotations).

As it pertains to the third factor, although this case, like the defendant's prior convictions, involves acts of violence, and, in one instance, use of a firearm, that fact alone does not render his prior convictions too similar to the instant case such that there is a risk of unfair prejudice.  See, e.g., White, 2009 WL 4730234, at *4 (admitting, in a felon in possession of a firearm case, the name of the offense, the date, and the sentence of previous robbery conviction for impeachment purposes); see also Thomas, 214 F. Supp. 3d at 196 (same).  In fact, the offenses with which the defendant is charged are far more serious than his prior convictions, further reducing any chance of unwarranted prejudice.  Cf. United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990) (holding that evidence introduced pursuant to Fed. R. Evid. 404(b) is not unfairly prejudicial when it "[does] not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged").  For example, the prior offenses do not concern the defendant's leadership in the Enterprise or charges of murder, as in the instant case—offenses that are far more serious than his prior convictions.  Should the defendant choose to testify, the fact that he has previously been convicted of robbery (while displaying a firearm), assault, and attempted assault would be relevant to the jury's determination of his character for truthfulness.

The fourth and fifth factors—the importance of the defendant's testimony and the centrality of the credibility issue—also weigh in favor of the government.  Should the defendant testify and disclaim his participation in the charged offenses, then his credibility versus that of the government's witnesses and other evidence will be central to the jury's determination of guilt.

This weighs strongly in favor of permitting inquiry into the crimes set forth above, which constitute only some of the defendant's criminal convictions. See, e.g., Ortiz, 553 F.2d at 785 (holding that where the case is "narrowed to the credibility of two persons the accused and his accuser . . . there is greater, not less, compelling reason for exploring all avenues which would shed light on which of the two witnesses is to be believed"). As the Second Circuit has explained, a defendant "has no right to avoid cross examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him." Payton, 159 F.3d at 58.

VI.    Certain Business and Public Records are Admissible[22]

At trial, the government intends to introduce the following certified business records: T-Mobile subscriber and toll records; Facebook, Instagram and Meta account records; and certain public records that are sealed and signed or signed and certified, specifically, fingerprint cards, criminal history records and death certificates. The government has previously provided the defense with the certifications and notice that it intends to introduce these records at trial; any additional certifications will be provided upon receipt from the relevant entity.

A.    Applicable Law

The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation. See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). The Court has explained that "[b]usiness and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Id. at 324.

---

[22]    Based on conversations with defense counsel, the government understands the defense is willing to stipulate to the authenticity of these types of records, but the government nonetheless submits this argument in an abundance of caution.

Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and are permissible. See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005). As the Seventh Circuit explained in Ellis, such certifications are "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record." 460 F.3d at 927. It is the underlying records, not a certification, that are admitted to establish the facts.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business records by certification and sets forth specific requirements for their admission. Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification, and courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial. See, e.g., United States v. Komasa, 767 F.3d 151 (2d Cir. 2014); Qualls, 613 F. App'x at 28 (affirming admission of foreign business records based upon a certification, absent a live witness to authenticate the documents). Further, Federal Rule of Evidence 902(13) permits the authentication of records generated by an electronic process or system. See United States v. Otufale, No. 24-CR-170 (KAM), 2024 WL 3391094, at *9 (E.D.N.Y. July 12, 2024) (finding that records generated by an electronic process or system "may constitutionally be admitted in a criminal trial absent live testimony from the custodian because such records are not 'testimonial.'" (quoting Melendez-Diaz, 557 U.S. at 311 n.1)).

Likewise, under Federal Rules of Evidence 902(1) and 902(2), domestic public

54

documents are self-authenticating and "require no extrinsic evidence of authority in order to be admitted" so long as they bear either (i) a seal and signature, <u>see</u> Rule 902(1), or (ii) "a signature of an officer or employee" of a "department, agency or officer" of "any state," <u>see</u> Rule 902(2).

B.    <u>Discussion</u>

The government should be permitted to authenticate and admit the relevant T-Mobile; Facebook, Instagram, and Meta; and sealed and signed or signed and certified public records, because doing so is proper under the law.  The government intends to offer these records at trial under Rules 803(6)(D), 902(1), 902(2), 902(11) and 902(13) pursuant to certifications that meet the requirements of Rule 803(6)(A)-(C).  As noted, the government has provided the defense, and will continue to provide as they become available, the certifications and underlying business and public records in discovery, and the defense is hereby informed of the government's intention to offer them as evidence at trial.  Such a process would eliminate unnecessary persons from the courtroom, shorten the amount of time that jurors will need to sit for trial, and ensure that witnesses who may reside outside New York need not travel to New York to appear at trial.  Accordingly, the government seeks a pretrial ruling that these records may properly be authenticated as self-authenticating business and public records and respectfully requests that the Court admit the above referenced business records at trial pursuant to Rules 803(6)(D), 902(2), 902(11) and 902(13).

VII.   <u>Anonymous Jury</u>

For the reasons set forth below, the Court should empanel an anonymous jury and not allow disclosure to any of the parties of the names, precise addresses and workplaces of members of both the venire and the selected jury.

A.    <u>Applicable Law</u>

The Second Circuit has repeatedly upheld the use of anonymous juries where there is reason to believe the jury needs protection and reasonable precautions are taken to minimize any

adverse effect on the jurors' opinion of the defendant.  See, e.g., United States v. Kadir, 718 F.3d 115, 120-21 (2d Cir. 2013); United States v. Pica, 692 F.3d 79, 81 (2d Cir. 2012); United States v. Quinones, 511 F.3d 289, 291 (2d Cir. 2007); United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); Wong, 40 F.3d at 1376-77 (2d Cir. 1994); United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

The Second Circuit has adopted a two-step process for courts to follow when empaneling an anonymous jury.  A court should first determine whether there is strong reason to believe that the jury needs protection.  If so, the court should then take reasonable precautions to minimize any prejudice that might arise from an anonymous jury.  See Paccione, 949 F.2d at 1192. Importantly, use of an anonymous jury "does not infringe a defendant's constitutional rights, so long as the court conducts a voir dire designed to uncover any bias as to the issues or the defendant[] and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities."  Aulicino, 44 F.3d at 1116.  Thus, "the decision whether or not to empanel an anonymous jury is left to the district court's discretion."  Paccione, 949 F.2d at 1192.

Courts in this circuit have considered various factors to determine whether there is reason to believe the jury's safety and impartiality needs protection: (1) the dangerousness of the defendant, (2) whether the defendant or his associates have engaged in past attempts to interfere with the judicial process, (3) whether the defendant has access to the means to harm the jury, and

(4) whether the trial is likely to attract media attention and publicity.  See United States v. Wilson, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (citing Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132-33 (2d Cir. 1989)).  Notably, all of these factors need not be present; "anonymity is appropriate when some combination of these factors is present."  United States v. Ashburn, 13-CR-303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014).

Two procedures adequately protect a defendant's right to an unbiased jury when an anonymous jury is used.  First, the court should "conduct a voir dire designed to uncover bias as to issues in the case[ ] and as to the defendant himself."  Paccione, 949 F.2d at 1192.  Second, to reduce the possibility that the jury will infer that the defendant is dangerous, the court should give the jurors "a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures."  Paccione, 949 F.2d at 1192; see also Aulicino, 44 F.3d at 1116.  In many cases, courts instruct the jury that the additional safeguards are to protect against intrusion by the media.  See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1191-92; Thomas, 757 F.2d at 1363.

B.    Analysis

Applying the standards and factors set forth above, protecting the jurors' identities is in the interest of justice in this case.  Most importantly, the defendant is dangerous and, based on the evidence to be presented at trial, is likely to be perceived by the jurors as dangerous.

The evidence will depict a pattern of violence by the defendant and fellow members of GSM.  Specifically, the defendant is charged with two murders, and the gang he led was part of a back-and-forth murder rivalry.  These acts are exactly the type of senseless violence that "would cause a juror to reasonably fear for his own safety."  Vario, 943 F.2d at 241.  In Barnes, the Second Circuit explained one important reason for empanelling anonymous juries in cases like this:

> If a juror feels that he and his family may be subjected to violence
> or death at the hands of a defendant or his friends, how can his
> judgment be as free and impartial as the Constitution requires?  If

57

> the anonymous juror feels less pressure as a result of anonymity, . . .
> this is as it should be — a factor contributing to his impartiality.

604 F.2d at 140-41 (use of anonymous, sequestered jury "comported with [a court's] obligation to protect the jury, to assure its privacy, and to avoid all possible mental blocks against impartiality").

Similarly, in Thomas, the Second Circuit found that the protection of jurors is vital to the function of the criminal justice system and further articulated the importance of using jury anonymity as a mechanism to ensure a fair and impartial verdict free from fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict.

757 F.2d at 1364.

In this case, the jurors will be confronted with evidence that the defendant and his fellow gang members demonstrated callous brutality in participating in the charged crimes. If the defendant had so little regard for human life as to murder not one, but two people, the jurors (if their identities are disclosed) will be left to wonder what the defendant and his criminal associates would be willing to do to retaliate against them for his conviction and lengthy imprisonment. See Barnes, 604 F.2d at 141 (allegations of "dangerous and unscrupulous conduct" and pretrial publicity supported withholding jurors' names and addresses); see also Thomas, 757 F.2d at 1364 (history of violence — including "mob-style" killings — related directly to the issue of juror safety or fear of reprisal). Thus, the serious nature of the charges and the "pattern of violence by the defendant[] and his associates such as would cause a juror to reasonably fear for his own safety" is alone sufficient to warrant an anonymous jury in this case. Vario, 943 F.2d at 241.

In addition, the defendant is the godfather of GSM, an ongoing criminal enterprise. Although the defendant is under pretrial detention, his criminal associates "are currently, and will

be, at large at the time of the trial." Wilson, 493 F. Supp. 2d at 400. Finally, based on the nature of the charges, the upcoming trial is likely to attract media attention.

      C.     An Anonymous Jury Will Not Prejudice the Defendants

         The government requests only that the names, precise addresses and workplaces of members of the venire and final jury not be revealed. This will not burden the defendant's ability to make informed choices during jury selection because—apart from referring to jurors by numbers (instead of names) and limiting questions about their residence and employment to avoid identification of specific locations — the voir dire can proceed as it would in a typical case.

         Although a defendant has the right to a meaningful voir dire of potential jurors, see Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981), the decision as to the questions to be asked in voir dire largely rests within the informed discretion of the trial court. See United States v. Silva, 715 F.2d 43, 50 (2d Cir. 1983) (absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed), overruled on other grounds by United States v. FNU LNU, 653 F.3d 144, 151 (2d Cir. 2011); Barnes, 604 F.2d at 140 ("As long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal."). Indeed, "[t]he jury selection process (voir dire) is not a matter of constitutional dimension and the selection of an anonymous jury was implicitly held to be constitutional in Barnes." United States v. Gotti, 777 F. Supp. 224, 227 (E.D.N.Y. 1991).

         The information that will be kept from the parties and counsel if this motion is granted is not meaningful to the jury selection process. Names, exact addresses and places of employment are not necessary to make an informed choice—information regarding the neighborhoods in which the prospective jurors live and the nature of their work is sufficient. The

names of prospective jurors, to the extent they provide information about ethnicity, are not relevant to meaningful voir dire.  See Georgia v. McCollum, 505 U.S. 42, 55 (1992) (prohibiting use of peremptory challenges in racially discriminatory manner by criminal defendants).

Moreover, empaneling an anonymous jury will not diminish the presumption of innocence because the Court can provide an instruction explaining this measure in a neutral way to prevent the jury from drawing any negative inference.  Most commonly, courts have explained that jurors' privacy and identities require protection from the media and the public, see, e.g., Thai, 29 F.3d at 801.  Courts have also told prospective jurors that anonymity would allow them to feel more comfortable in giving candid answers to the personal questions asked in voir dire.

Accordingly, the Court should empanel an anonymous jury and not allow disclosure of the names, precise addresses and workplaces of members of the venire and jury.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that its motions in limine should be granted in their entirety.

Dated:      Brooklyn, New York
            August 12, 2024

                                    Respectfully submitted,

                                    BREON PEACE
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201

Dana Rehnquist
Andrew M. Roddin
Elias Laris
Assistant United States Attorneys
        (Of Counsel)

60