UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------x

UNITED STATES OF AMERICA         :              21 Cr. 176 (S-2) (AMD)

          - v. -                 :

JOHN PENA,                       :

          Defendant.

----------------------------------x

**DEFENDANT JOHN PENA'S RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTIONS IN LIMINE**

Adam Bolotin
Law Offices of Adam Bolotin, LLC
26 Court Street, Suite 2103
Brooklyn, NY 11242
646-368-8688
Adam@BolotinLaw.com

Samuel Gregory P.C.
16 Court Street, Suite 2008
Brooklyn, N.Y. 11241
718-222-2992
Sam@SamGregory.com

Kenneth J. Montgomery PLLC
396 Waverly Ave.
Brooklyn, N.Y. 11238
718-403-9261
Ken@KJMontgomeryLaw.com

1

## <u>TABLE OF CONTENTS</u>

ARGUMENT ...................................................................................................................... 5

    I.     This Court Should Deny the Government's Request to Introduce Evidence

          Relating to the Tysean Benjamin Shooting and Murders of Davey Pena,

          Vincent Witt, Anthony Morales ............................................................................ 5

    II.    The Court Should Deny the Government's Blanket Request to Admit

          Hearsay Statements ............................................................................................... 7

    III.   This Court Should Deny the Government's Request to Introduce Lyrics

          that Generically Describe Acts of Violence .......................................................... 10

    IV.   An Anonymous Jury Is Not Necessary ................................................................. 13

    V.    The Court Should Not Permit the Government to Cross Examine Mr. Pena

          on His 2009 and 2013 Convictions ...................................................................... 15

CONCLUSION .................................................................................................................. 16

**TABLE OF AUTHORITIES**

**Cases**

*United States v. Ayers*, 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024)............................ 11, 12, 13

*United States v. Brown*, 606 F.Supp.2d 306 (E.D.N.Y. Mar. 9, 2009)........................................ 16

*United States v. Estrada*, 430 F.3d 606 (2d Cir. 2005).................................................................. 15

*United States v. Greer*, 631 F.3d 608 (2d Cir. 2011).................................................................... 5

*United States v. Gupa*, 747 F.3d 111 (2d Cir. 2014) .................................................................... 8

*United States v. Jordan*, 2024 WL 343970 (E.D.N.Y. Jan. 30, 2024)...................... 10, 11, 12, 13

*United States v.* Martoma, 2014 WL 31191 (S.D.N.Y. Jan. 6, 2014)........................................... 5

*United States v. Napout*, 963 F.3d 163 (2d Cir. 2020)........................................................... 14, 15

*United States v. Ojudun*, 915 F.3d 875 (2d Cir. 1999) .............................................................. 9

*United States v. Pica*, 692 F.3d 79 (2d Cir. 2012) .................................................................... 13

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) ............................................................ 14

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) .................................................................... 8

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012) ............................................................... 7

*United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83 (2d Cir. 1999) .............................. 8, 13

*United States v. Thomas,* 757 F.2d 1359 (2d Cir. 1985).............................................................. 14

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989)................................................................ 13

*United States v. Vario,* 943 F.2d 236 (2d Cir. 1991) ................................................................... 13

*United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008) .................................................................. 9

*United States v. White*, 312 F.Supp.3d 355 (E.D.N.Y May 9, 2018) .......................................... 15

*United States v. Wiley*, 610 F. Supp. 3d 440 (D. Conn. July 8, 2022)........................................ 11

*United States v. Wong,* 40 F.3d 1347 (2d Cir. 1994).................................................................. 14

*United States v. Zhong*, 26 F. 4th 536 (2d Cir. 2022) ..................................................................... 7

*Williamson v. United States*, 512 U.S. 594 (1994) ........................................................................ 9

**Other Authorities**

Bob Marley and the Wailers, *I Shot the Sheriff*,  on *Burnin'* (Tuff Gong Island 1973) .............. 10

Michael Eric Dyson, Forward, *That's the Joint!: The Hip-Hop Studies Reader* (Forman & Neal

   eds. 2004) ................................................................................................................................ 10

**Rules**

Fed. R. Evid. 401 ........................................................................................................................ 10

Fed. R. Evid. 403 .................................................................................................................... 5, 10

## ARGUMENT

I. **This Court Should Deny the Government's Request to Introduce Evidence Relating to the Tysean Benjamin Shooting and Murders of Davey Pena, Vincent Witt, Anthony Morales**

The government contends a shooting and three additional murders, all of which were allegedly committed by individuals of a different criminal enterprise, are necessary for the jury to understand the complete picture underlying the charged conduct. Though the Second Circuit permits the government to do so, this court may only admit such evidence when it "satisfies the probative-prejudice balancing test of Rule 403." *United States v. Greer*, 631 F.3d 608 614 (2d Cir. 2011). Importantly, even relevant evidence is excluded when "its probative value is substantially outweighed by . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Here, Tysean Benjamin's shooting and the murders of David Pena, Vincent Witt, and Anthony Morales, provide limited probative value and context to the charged offense. Truly, these noncharged allegations are only necessary to understand each other.

In describing the charges, the government alleges Mr. Pena and GSM members killed Mr. Bajandas on March 10, 2021 because Mr. Bajandas defected from GSM to Bugatti. That narrative is straightforward and sufficiently proven by the evidence that directly relates to that shooting and the murder of Avanti Brock. *See United States v.* Martoma, No. 12-CR-973 (PGG), 2014 WL 31191, at *3 (S.D.N.Y. Jan. 6, 2014) As the government alleges, a rift between GSM and Bugatti developed after Mr. Brock was murdered. In the aftermath of that rift, Mr. Bajandas defected from GSM and joined Bugatti. Mr. Pena accordingly acknowledges the murder of Avanti Brock satisfies the line of cases cited by the government. Evidence of additional shootings and murders, is a different story.

5

The government contends the additional acts are needed to establish the animosity between GSM and Bugatti and in turn why Mr. Bajandas was targeted. Mr. Brock's murder, however, does exactly that. Consequently, Mr. Benjamin's shooting, and the murders of Mr. Pena, Mr. Witt, and Mr. Morales are unnecessary. Rather, evidence of four additional crimes will be cumulative to a point established by a single murder. Furthermore, the four additional acts will only confuse the jury of the issues at hand, enflame the passions of the jurors, and create trials within the trial.

These four additional acts provide even less context to Mr. Gonzalez's murder. According to the government, Mr. Pena murdered Mr. Gonzalez in response to Mr. Gonzalez's retaliation against Mr. Pena's slashing of Mr. Gonzalez and Mr. Gonzalez's cooperation with law enforcement's investigation into that slashing. Just as he does with Mr. Brock's murder, Mr. Pena acknowledges that uncharged slashing is necessary background for the jury to understand the government's theory of Mr. Gonzalez's murder. That theory shows any animosity between GSM and Bugatti and crimes committed based on that rift played zero role in Mr. Gonzalez's murder. Accordingly, shootings and murders do nothing to explain the narrative.

Essentially, introduction of the Benjamin shooting, David Pena's murder, Mr. Witt's murder, and Mr. Morales' murder are unnecessary to complete the narrative of the charged conduct. These events do not explain the charged conduct at all. Instead, they are only necessary to explain each other. David Pena's murder only explains why GSM associates retaliated against Tysean Benjamin. In turn, Mr. Benjamin's shooting explains why Mr. Witt was murdered. But none of the charged events were committed in response to or because any of these acts. If any one of the acts are unnecessary then there is no reason to admit all of them.

Relatedly, Mr. Morales' murder does not provide any context as to why Mr. Bajandas was murder. Rather, it is the other way around -Mr. Bajandas' murder explains why Bugatti members

6

went after Mr. Morales. But, Bugatti members are not on trial here and Mr. Morales' murder fails to provide any necessary context to crimes the government alleges Mr. Pena and his coconspirators committed.

"If 'necessary,' the government may introduce evidence of uncharged criminal conduct 'to complete the story of the crime on trial,' not tell a new one." *United States v. Zhong*, 26 F. 4th 536, 552 (2d Cir. 2022) (quoting *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012). These acts are only needed to tell a new narrative and not the one charged. Indeed, all of the murders were purportedly committed by members by a completely different enterprise. This court should accordingly bar the government from introducing evidence relating to the shooting of Mr. Benjamin and the murders of David Pena, Mr. Witt, and Mr. Morales.

## II.    The Court Should Deny the Government's Blanket Request to Admit Hearsay Statements

The government moves to broadly admit statements made by Mr. Pena, his alleged coconspirators, and Mr. Bajandas. In doing so, the government refers to nonspecific swaths of statements that purportedly further the conspiracy in various ways. (Dkt. 79 at 22). Because the motion fails to spell out the specific statements that do what the government describes in the bullet points set forth on page 22 of its motion, it is impossible for this court to determine whether the statements actually further the conspiracy and are relevant. The court should accordingly direct the government to specify what statements it intends to introduce before determining their admissibility.

The government's references to specific statements, namely the statements written by a coconspirator in his notes application of his phone did not further the conspiracy whatsoever. (Dkt. 79 at 25). It is difficult to imagine how statements found on a note taking application that were not relayed to other persons, let alone coconspirators, could "prompt the lister not respond in a way

7

that facilitates the carrying out of criminal activity," as the hearsay exception requires. *United States v. Rahme*, 813 F.2d 31, 35 (2d Cir. 1987). Because the statements are notes, there is no 'listener' and the statements cannot be said to promote anyone to do anything.

Furthermore, "to be in furtherance of the conspiracy, a statement must be more than 'a merely narrative' description by one co-conspirator of the acts of another." *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88 (2d Cir. 1999) (internal citations omitted). The statements are nothing more than a description of the writer's standing in the neighborhood the government alleges GSM operated while another unnamed co-conspirator was about to do something. In other words, these statements are nothing more than narratives that do not satisfy the coconspirator exception.

Turning to Mr. Pena's statements. Though Mr. Pena's statements are statements by a party opponent, "the fact that a hearsay statement falls within an exception does not make the statement admissible." *United States v. Gupa*, 747 F.3d 111, 139 (2d Cir. 2014). Rather, each statement must satisfy relevance requirements. *Id.* The government moves to admit statements that are probative of various relevant issues, *i.e.* statements that "promote the Enterprise or discuss its members' criminal conduct," but fails to detail the specific statements that do so. Consequently, this court cannot determine whether the statements are actually probative of those legitimate purposes.

The specific statements the government does detail fall short. For instance, the government argues Mr. Pena's statement about his life being "drama free" since May 10, 2021 amounts to Mr. Pena taking responsibility for Mr. Bajandas murder which occurred on May 10. (Dkt. 79 at 5). The plain reading of the statement, however, only shows Mr. Pena's knowledge that "drama," aka Mr. Bajandas, is no longer alive since May 10th. While the statement shows indifference towards Mr. Bajandas's passing, it does not take credit for the murder or provide details of how it was

8

committed that would indicate Mr. Pena's involvement. The statement, accordingly, is not relevant and should not be admitted.

Finally, though the government does a better job of detailing the specific statements it attributes to Mr. Bajandas, the statements are inadmissible because they are not self-inculpatory. Instead, the argument is a thinly veiled attempt to use Rule 804(b)(3) to introduce statements that directly inculpate Mr. Pena in additional crimes.

As the Supreme Court holds "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson v. United States*, 512 U.S. 594, 600-01 (1994). "This is especially true," the Court continued, "when the statement implicates someone else." *Id.* at 601. Statements that "incriminate[] the defendant 'exclusively' are "not within 'the penal interest exception.' *United States v. Ojudun*, 915 F.3d 875, 887 (2d Cir. 1999) (quoting *United States v. Wexler*, 522 F.3d 194, 202-03 (2d Cir. 2008)).

Here, though the government holds Mr. Bajandas's statements, that will be repeated through another witness, out to be statements against his penal interest. On the contrary, the statements' narrative overwhelmingly implicates Mr. Pena. To be clear, the statement at issue is not simply Mr. Bajandas's inculpatory statement that he "stole a gun," but rather that Mr. Pena gave him a gun to use to murder Zues. Perhaps, Mr. Bajandas's statement that he possessed a gun Mr. Pena gave to him is self-inculpatory, but what Mr. Pena purportedly asked him to do with it, or why Mr. Bajandas kept it against Mr. Pena's wishes cannot be reasonably construed as self-inculpatory. Importantly, Mr. Bajandas rejected Mr. Pena's request for him to murder Zues. Clearly, the statement deflects criminal responsibility entirely to Mr. Pena while placing zero on Mr. Bajandas. Accordingly, the statement cannot be admitted as a statement against penal interest.

### III.     This Court Should Deny the Government's Request to Introduce Lyrics that Generically Describe Acts of Violence

Though the Second Circuit holds it is a not a per se abuse of discretion to admit rap lyrics, this court must, as it does when deciding whether any piece of evidence is admissible, assess whether the evidence is relevant and whether its probative value is not substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. Evidence is only relevant when "it has any tendency to make a fact more or les probable than it would be without the evidence" and when "the fact is of consequence in degerming the action." Fed. R. Evid. 401.

In the context of lyrics, and more specifically rap lyrics, this court "must remain cognizant that 'hip hop is fundamentally an *art form* that traffics in hyperbole, parody, kitsch, dramatic license, double entendres, signification, and other literary and artistic conventions to get its point across.'" *United States v. Jordan*, 2024 WL 343970 at *3 (E.D.N.Y. Jan. 30, 2024) (quoting Michael Eric Dyson, Forward, *That's the Joint!: The Hip-Hop Studies Reader*, xii (Forman & Neal eds. 2004). Indeed, its undeniable that rap artists are "incentivized to create music about drugs and violence to gain commercial success, and will exaggerate or fabricate the contents of their music in pursuit of that success." *Id.* at *3. A mere glance at the Billboard Top 200's rap albums reveals overwhelming references to drug use, sales, violence, and often the combination of all three. *Id.* at *4.

And this is not a modern phenomenon. Even the peaceful Jamaican reggae icon Bob Marley found overwhelming commercial success in 1973 when he sang about shooting sheriff John Brown, who always hated Mr. Marley. Bob Marley and the Wailers, *I Shot the Sheriff*,  on *Burnin'* (Tuff Gong Island 1973). And yet, Mr. Marley was never brought up on murder charges. This is true because one cannot rationally accept lyrics as autobiographic statements even when the music

10

describes a first-person account. *United States v. Wiley*, 610 F. Supp. 3d 440, 446 (D. Conn. July 8, 2022).

Applying these common-sense principles, courts have drawn a clear line in the sand when the government seeks to admit lyrics in criminal trials. Detailed lyrics that describe specific events are admissible, while lyrics that refer to generic lawlessness are not. *Jordan*, 2024 WL 343970, at *4; *United States v. Ayers*, 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024). Reviewing these decisions is instructive.

In *Jordan*, the court rejected the government's motion to introduce the lines "I aim for the head, I ain't a body shooter," and "we aim for the head, no body shots, and we stick around just to see the body drop." *Jordan*, at *5. Though the defendant faced charges for a headshot shooting, the court stressed, the lyrics did not mention the victims by name, where the shooting occurred, or any alleged accomplices. *Id.* The court therefore held the lyrics "were generic references to violence" and were not admissible.

Similarly, in *Ayers* the court permitted the government to introduce lyrics that detailed the enterprise's motive to avenge a fallen member that prompted one of the charged murders. *Ayers*, 2024 WL 1158686 at *7. The court, however, rejected the government's motion to introduce songs, some of which were performed by other members, that purportedly "confirm[s] the existence of the enterprise," and described the gang's practice of "hunt[ing] down" and "violently assault[ing]" gang rivals. *Id.* Because the defendant was not the songs' performer, the court reasoned, lyrics were inadmissible "hearsay offered to prove the truth of the matter asserted - namely, that the [enterprise] is violent and promotes lawlessness." *Id.* The court also held the words that detailed "efforts to hunt down" rivals and "violently assault them" fell short. The court rejected the government's request to treat the lyrics as "as factual accounts of people or events" because of

the "commercial pressure [that] incentives emcees to embellish their songs with hyperbole and even fabrication about supposed criminal activity." *Id.* (citing *Jordan,* at *3). When weighed in the context of the genre, the lyrics plainly "read more like vapid posturing than confessions or plans about specific criminal conduct." *Id.*

This court should apply the same scrutiny to the mountain of lyrics the government moves to introduce. Every single lyric the government seeks to admit in Exhibit B mirrors those rejected by *Johnson* and *Ayers*. *See* Ex. A.[1] The lyrics do not provide detail where certain criminal acts occurred, how they were committed, who committed them, when they were committed, or who the specific victims were. Without these details lyrics that reference leaving unnamed individuals "dead on arrival," not hesitating to commit violent acts, "spinnin,'" doing "hits," going after "opps," or descriptions of unnamed individuals being killed for their "affiliations," are nothing more than inadmissible generic references to violence. Even the lyrics that name specific people do not go on to describe with any specifics what the author did, or plans to do to avenge that person. In totality, the lyrics offered by the government are hyperbolic posturing that defines rap music.

Turning more specifically to the lyrics outlined in Exhibit C. The government contends it "narrowly tailored its request." (Dkt. 79 at 31, n 13). It did not. Exhibit C is over 130 pages of lyrics, the vast majority of which are nonspecific variety. Even the lyrics the government identifies as "evidence of the defendant's guilt in the charged murders, including descriptions of the murders themselves" fall short of doing so. For instance, the government seemingly holds "his Top! Three up in his face! It turned his roof into a drop!" and "left his brains on the sheets man what was he thinkin'" as confessions to Mr. Gonzalez's murder, yet the lyrics cannot be distinguished from

---

[1] Ex. A mirrors the government's Ex. B, but adds specific responses in a far right column.

"two in the dome, he's down," "two shots hit him in the face when they blasted," and "knock knock knock, your brain on the doormat" that *Jordan* held were indistinguishable from "any other headshot style murder that took place before the lyrics were written." *Jordan*, at * 6.

Finally, many of the lyrics the government seeks to admit are not even authored by Mr. Pena. Accordingly, the lyrics authored by Mr. McKoy and Jesus Velasquez are inadmissible hearsay statements that the government is clearly offering for the truth of what it claims the statements assert. *Ayers*, 2024 WL 1158686 at *7; *see also SKW Metals & Alloys, Inc.*, 195 F.3d at 88 (holding to be in furtherance of the conspiracy, a statement must be more than 'a merely narrative' description by one co-conspirator of the acts of another.").

## IV.   An Anonymous Jury Is Not Necessary

Mr. Pena objects to the government's request for an anonymous jury. Empaneling an anonymous jury "carries with it numerous risks," including "the possibility of unfair prejudice to the defendant and the danger of encroaching on the presumption of innocence." *United States v. Tutino*, 883 F.2d 1125, 1132 (2d Cir. 1989). Anonymous juries are only necessary where "there is strong reason to believe that the jury needs protection." *Id.* Even where such a finding is made, the court must take precautions "to minimize the effect that such a decision might have on the jurors' opinions of the defendant[]." *Id.*

Here, the government asserts an anonymous jury is necessary because Mr. Pena is accused of committing murders and other violent acts. These allegations, though serious, fall short from those courts hold necessitate the drastic step of empaneling an anonymous jury. *See United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012) (approving anonymous jury based on defendant's "history of jury tampering"); *Tutino*, 883 F.2d at 1132-33 (sanctioning anonymous jury where defendant tampered with previous jury by having associate approach "at least three jurors" to ask them to acquit); *United States v. Vario*, 943 F.2d 236, 239 (2d Cir. 1991) (approving anonymous jury based

on "grand jury tampering" and expected publicity); *United States v. Wong,* 40 F.3d 1347, 1376-77 (2d Cir. 1994) (approving anonymous jury where defendants previously murdered a witness who testified against a gang member; gang "undertook to locate the sole eyewitness to [certain shootings] in order to kill her before she testified"; gang leader discussed trying to locate a witness's family to dissuade witness from testifying; and gang leader was still at large); *United States v. Quinones*, 511 F.3d 289, 295 (2d Cir. 2007) (approving anonymous jury where defendants were charged with "murdering a confidential information in retaliation for his cooperation"); *United States v. Thomas,* 757 F.2d 1359, 1364 (2d Cir. 1985) (approving anonymous jury where defendants "participated in several 'mob-style' killings," including "murdering government witnesses").

As these decisions make clear, violent charges unaccompanied by evidence or allegations the defendant engaged in witness or jury tampering do not necessitate an anonymous jury. Here, the government does not base its request for anonymous jury on Mr. Pena or any alleged coconspirators threatening, retaliating against, or otherwise attempting to endanger trial witnesses, government cooperators, or prospective jurors during the course of the conspiracy or otherwise. This court should accordingly deny the request.

Alternatively, if the court finds a anonymous jury is necessary, the court should consider publicly referring to jurors by number (and telling jurors this is the regular practice to protect their privacy or prevent media intrusions) but disclosing jurors' names (i) to the parties or (ii) to counsel on an "attorneys' eyes only" basis. This would allow for an adequate voir dire and jury selection process, while obviating any concerns about juror safety. For example, in *United States v. Napout*, 963 F.3d 163, 189 (2d Cir. 2020), the district court "ensur[ed] that the jury was not anonymous with respect to any of the parties. While the jurors' identities were kept from the public, the

14

appellants and their counsel (and the government, too) were provided with the names of the prospective jurors during jury selection and were free to investigate any of them for potential bias." *Napout*, 963 F.3d at 189. If the court sees any need for anonymity, it should follow the same procedure here.

## V.      The Court Should Not Permit the Government to Cross Examine Mr. Pena on His 2009 and 2013 Convictions

Mr. Pena does not object to the court permitting the government to cross examine him regarding the 2017 Attempted Robbery conviction as it is a felony within 10 years. Mr. Pena does, however, object to the 2009 convictions as they are outside the 10 year period and the 2013 attempted assault as it is a crime that does not have a bearing on credibility.

The Second Circuit distinguishes crimes of violence, which have little probative value for truthfulness, and theft crimes like robbery which are probative of a witness's credibility. *United States v. Estrada*, 430 F.3d 606, 621 (2d Cir. 2005). "Assault-like crimes do not usually relate to credibility" and carry limited impeachment value. *United States v. White*, 312 F.Supp.3d 355, 362 (E.D.N.Y May 9, 2018). Here, even if the court finds the 2009 attempted robbery conviction which is far outside the 10 year time period, is admissible it should preclude the government from confronting Mr. Pena with the 2009 assault in the Second degree conviction as it has limited bearing on credibility. Similarly, although the 2013 attempted assault in the second degree conviction is within the 10 year time period, it is not a crime that involves dishonesty and accordingly carries limited probative value to Mr. Pena's credibility. *Id.*

Though 2009 attempted robbery in the Second degree has more probative value than the assault conviction, the court need not admit it if it permits the government to confront Mr. Pena with the exact same conviction that occurred more recently -namely the 2017 attempted robbery conviction. The more recent conviction provides the government with a sufficient basis to attack

15

Mr. Pena's credibility and the court need "not permit the government to resort to a 'piling on' effect". *United States v. Brown*, 606 F.Supp.2d 306, 314 (E.D.N.Y. Mar. 9, 2009).

If this court does allow the government to confront Mr. Pena with any of these convictions, Mr. Pena requests the court bar the government from crossing on the facts underlying the convictions. Instead, the court should only permit the government to introduce the date, jurisdiction and statutory name of the offense, specifically omitting the "displaying what appeared to be a firearm and "intent to cause physical injury with a weapon/instrument" language. *Brown*, 606 F.Supp.2d at 315 ("courts have found that the minimal probative value of a prior conviction for gun possession is far outweighed by its potential for unfair prejudice.").

## CONCLUSION

For the reasons stated above, Mr. Pena respectfully requests the court deny the government's motions in limine.


Dated: Brooklyn, NY
        August 22, 2024

                                        Respectfully submitted,



                                        _____
                                        Adam Bolotin
                                        Law Offices of Adam Bolotin, LLC
                                        26 Court Street, Suite 2103
                                        Brooklyn, N.Y. 11242
                                        Office Phone: 646-368-8688
                                        Email: Adam@BolotinLaw.com

Samuel Gregory
Kenneth J. Montgomery

cc:     Clerk of Court (AMD) (by email and ECF)
        Counsels for the government (by email and ECF)


16