UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
          :
**UNITED STATES OF AMERICA**,
          :
    – against –          :  **MEMORANDUM DECISION AND ORDER**
          :
**JOHN PENA**,          21-CR-176 (AMD)
          :
    Defendant.    :
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The defendant was convicted after a jury trial of racketeering (18 U.S.C. § 1962(c)) (Count One), as well as the following racketeering acts: marijuana and cocaine base distribution conspiracy (Racketeering Act One A), marijuana and cocaine base distribution (Racketeering Act One B), the murder of Mark Bajandas (Racketeering Act Two), and the murder of Francisco Gonzalez (Racketeering Act Three). The defendant was also convicted of unlawful possession, brandishing and discharge of a firearm (18 U.S.C. § 924(c)(1)(A)) (Count Two), murder in-aid-of racketeering (18 U.S.C. § 1959(a)(5)) (Count Three), causing death through use of a firearm (18 U.S.C. § 924(j)) (Count Four), being a felon in possession of ammunition (18 U.S.C. § 922(g)(1)) (Count Five), and conspiracy to distribute and possess with intent to distribute marijuana and cocaine base (21 U.S.C. §§ 841(a)(1), 846) (Count Six).

Over the course of an eight-day jury trial, the government called 27 witnesses and introduced hundreds of exhibits, including text messages, handwritten notes, rap lyrics, and video and photographic evidence. The evidence, as detailed below, established that the defendant was the leader of a racketeering enterprise, the Gorilla Stone Mafia ("GSM"), a subgroup of the Bloods street gang which engaged in murder, assaults, robbery and drug dealing,

among other crimes.  The government also proved that the defendant, aided by other gang members, shot and killed former GSM members Mark Bajandas and Francisco Gonzalez to further the goals of the racketeering enterprise.

Before the Court is the defendant's motion for a judgment of acquittal on Count One, Racketeering Act One A and B, Racketeering Act Three and Count Six.  (ECF No. 138.)  He argues that the evidence was insufficient to establish that he murdered Gonzalez to further the goals of GSM.  He also claims that the government did not prove that he distributed and conspired to distribute marijuana and cocaine base.  The government opposes.  (ECF No. 141.)  As explained below, the motion is denied.

## BACKGROUND

### I. Evidence at Trial

#### a. The Government's Case

From 2019 to 2021, the defendant was the leader of GSM, a Staten Island street gang that was part of the Untouchable Gorilla Stone Nation ("UGSN") and the Bloods.  (*See* Trial Transcript ("T. Tr.") 102:06–103:11, 178:22-24, 368:14.)  GSM members made money by selling drugs, identity theft, and fraud.  (*See* T. Tr. 108:14-15, 289:01-03.)  Members also committed violent crimes — shootings, assaults, robberies, and murders — to enhance the gang's reputation and demonstrate its dominance over rival gangs.  (*See* T. Tr. 108:14-15, 108:25–109:07, 289:01-03, 396:02-07, 410:21-24, 426:12-13.)  GSM members called the defendant the "godfather" because of his leadership position.  (T. Tr. 102:08–103:11, 127:01-17, 1303:07-25; Government Exhibit ("GX") 307 at 6318.)  The defendant ordered GSM members to sell drugs, and to assault and kill rival gang members and others deemed insufficiently loyal to GSM or the defendant.  (T. Tr. 153:02–154:04, 346:17–347:14, 410:25–411:25; GX 2237A.)

    *i.*  *Marijuana and Cocaine Base Distribution and Conspiracy*

GSM members sold crack cocaine, heroin, and marijuana outside the Green Apple Deli in the Stapleton neighborhood of Staten Island, New York and in Vermont. (T. Tr. 289:06-08, 289:20–291:09, 292:02-05.) The defendant supplied the drugs, directed GSM members to sell them and sometimes sold drugs himself. (T. Tr. 289:20–291:09, 292:02-05, 320:04-06, 1055:11-24; GX 355.)[1] Because he was a leader, he received some of the proceeds even when he did not participate personally in a sale. (T. Tr. 153:02-16.) In addition, the defendant and his roommate, a high-ranking GSM member, cooked crack cocaine in the apartment. (T. Tr. 289:20-25, 290:11-13.) The defendant also had access to a drug addict's apartment where he and other members cooked and stored drugs. (T. Tr. 290:25–291:01.) In addition, the defendant directed the gang's narcotics operation in Vermont, and sometimes traveled there by bus with other gang members to sell drugs. (T. Tr. 122:11-15, 313:07-10; 320:04-06, 1055:11-24; *see also* GX 307 at 6278 (the defendant's handwritten notes referring to one Vermont trip).)

    *ii.*  *The Murder of Mark Bajandas*

Mark Bajandas was a member of GSM until 2020, when he joined Bugatti, a rival gang; Bajandas left GSM because he thought that the defendant was "hiding" from rival gangs, and because he did not retaliate when Bugatti members killed GSM members. (T. Tr. 162:25–164:14.) After Bajandas defected, GSM labeled him a "deal" — a "person with a target on their back." (T. Tr. 113:11-16, 132:11-23.) The defendant told Jordan Taylor that Bajandas was a "traitor." (T. Tr. 165:01–166:11.)[2]

---

[1] The defendant did not personally sell drugs at the Green Apple Deli because he was concerned the police would show up. (*See* T. Tr. 292:09–293:6.)

[2] Taylor testified pursuant to a cooperation agreement, pursuant to which he pled guilty to racketeering — including racketeering acts of attempted murder, counterfeiting, and distribution of marijuana and cocaine base — attempted murder in-aid-of racketeering, Hobbs Act Robbery, using a gun during a robbery, access device fraud, aggravated identity theft, and felon in possession of a

On March 10, 2021, the defendant and other GSM members held a memorial at a Stapleton basketball court for GSM member Avanti Brock, who had been murdered by a Bugatti member. (T. Tr. 185:17-23, 482:09–483:22.) The defendant posted a video on social media and "dropped his location . . . letting it be known where he's at" to show "they're not hiding." (T. Tr. 483:23–484:16.) Bajandas sent GSM member Henry Degroat a text message asking if he could attend the memorial and that "[he's] not coming sitchy," meaning he would not have a gun. (T. Tr. 286:21-22; GX 3173.) Degroat replied that "[he] don't need nothing ty coming to get u." (GX 3173.) The defendant opened fire on Bajandas as he arrived at the memorial, killing him. (GX 530 at 13:03-09; GX 453 at 3, 5–12.)

>        *iii.*        *The Murder of Francisco Gonzalez*

Francisco Gonzalez was "kicked out" of GSM in 2018 because he and Jada McCombs, the defendant's ex-girlfriend, "smoked all of the marijuana" that the defendant gave them to sell. (T. Tr. 171:14-20, 172:03-15, 473:09-10.)[3] The defendant announced that Gonzalez was a "deal." (Tr. Tr. 172:06-15.) Aspiring GSM member Justice Vick slashed Gonzalez's face, an act that earned him admission into the gang. (T. Tr. 173:09-21.) Gonzalez retaliated by shooting at the defendant and other GSM members, which ensured that he was still a "deal." (T. Tr. 176:18–177:10.)

According to Jordan Taylor, Gonzalez was a "deal" "[f]rom 2018 to the day he was killed" (T. Tr. 473:09-10); "If you see [Gonzalez], you was supposed to do something to him. . . . Any type of violence. Anything. If you didn't have a gun . . . and you had a knife[,] stab him. If

---

firearm. (*See* T. Tr. 466:20–470:22.) In exchange for his cooperation the government agreed to file a motion pursuant to U.S.S.G. ¶ 5K1.1 and 18 U.S.C. § 3553(e) outlining the extent of his cooperation with the Court during sentencing. (*See* T. Tr. 612:06–614:12.)

[3] Jada McCombs testified pursuant to a judicial grant of immunity. (T. Tr. 1050:15–1052:23, 1054:03-16.)

4

you didn't have a knife or a gun, punch him." (T. Tr. 177:04-17.) If a member had a gun, the member was supposed to kill Gonzalez. (T. Tr. 177:19.) The defendant also suspected that Gonzalez was cooperating with law enforcement, and asked McCombs if that was the case; McCombs responded that she did not know. (T. Tr. 1066:06-10.)

On the evening of June 21, 2021, Degroat and GSM affiliate Jawuan Jackson kept watch outside Gonzalez's building, 19 Stanley Avenue. (GX 757 at 1:17, 3:24-30, 7:30-45.)[4] At one point, Gonzalez asked Jackson to "[p]ull-up come smoke with [him]," which Jackson did. (GX 3208.) Later that night, Jackson wrote on his cell phone that he had a gun on Stanley Avenue and about the defendant's plan to kill Gonzalez: "I'm posed on Stan, Wit the chop [/] Don't try to spin through [/] Brody letting it flock." (GX 3195.)

The defendant, Degroat, and Jackson kept in cell phone contact throughout the night. (GX 3602.) The defendant texted Degroat to "[p]ick up" and told him, "Gang u can't ignore me." (GX 3602 at 1–2; GX 4000 at 12.) After the defendant arrived on Stanley Avenue, he broke the front door, while Degroat looked on, and went to Gonzalez's apartment on the second floor. (GX 757 at 12:08–13:11.) Gonzalez and McCombs were asleep; the defendant shot Gonzalez in the head three times, killing him. (T. Tr. 1066:20-23; GX 454, 953, 1011.) The defendant told McCombs, "[I]f [you] want[ ] be with [Gonzalez], [you] could be with him now." (T. Tr. 1066:24–1067:05.)[5] McCombs jumped from the window to the ground below.

---

[4] Surveillance video from outside Gonzalez's building captured Jackson's and Degroat's movements leading up to the murder. (*See* GX 757 at 0:45-13:11.) It also showed the defendant's arrival, and Degroat assisting him as he forced his way into the building just before murdering Gonzalez. (*See* GX 757 at 12:08-13:11.)

[5] McCombs did not know whether the defendant and Gonzalez were fighting before Gonzalez was killed. (T. Tr. 1057:23-24.) She recalled that the defendant and Gonzalez's relationship changed from "being friends to something else," but did not know what the change was (T. Tr. 1058:17-24) and when it happened (T. Tr. 1059:07-10). She did not know whether Gonzalez stole a gun from the defendant. (T. Tr. 1059:15-17.) On cross examination, counsel asked McCombs if it was true that the murder "wasn't about gang stuff," but "about love stuff;" McCombs answered, "Yes." (T. Tr. 1072:17-22.)

5

(T. Tr. 1067:12-14.) In her call to 911, she was "hysterical," and told the operator, "He shot him[.] [C]an you please hurry up? He's dying." (GX 757 at 16:10–20:04.) McCombs was at the side of the house when the police arrived; she asked them to "please help him" and led them to Gonzalez's body. (GX 757 at 20:04–20:45.)

In the meantime, the defendant ran out the back of the building and through a neighboring yard, where he was attacked by a dog. (*See* GX 757 at 23:25–30:12.) Detectives found him there the next morning, about five hours after he murdered Gonzalez, and arrested him. (*See* GX 757 at 30:30–32:35.) When detectives walked him through the back yard, to avoid Gonzalez's family and friends who had gathered on the street, the defendant asked why they were not taking him to the front of Gonzalez's building (T. Tr. 1224:04-09), and told them, "Y'all should have walked me out front" (GX 717 at 3:06-3:10; GX 717-T at 1).

While he was being held at the MDC, the defendant was notified by "kite" that he had been "promoted" to oversee GSM federal inmates. (GX 307 at 6318; T. Tr. 1302:16–1303.) The defendant told former UGSN member Tysheen Cooper, who was also at the MDC, that "[b]asically he has the whole entire situation now, like the whole set belongs to him. . . . he was moved up from whatever position he was to the godfather of the set," and that "he's not just a godfather for one particular area but he's the godfather for everywhere that that set may be." (T. Tr. 1303:05–1303:15.)[6] The defendant said that he was "excited" and "really happy," and that "it was about time he got his just due." (T. Tr. 1303:18-25.)[7]

---

[6] Cooper testified pursuant to a cooperation agreement, pursuant to which he pled guilty to racketeering conspiracy, conspiracy to commit murder in-aid-of racketeering, murder in-aid-of racketeering, and Hobbs Act Robbery. (T. Tr. 1279:25-1280:15.) In exchange for his cooperation the government agreed to file with the Court a motion pursuant to U.S.S.G. ¶ 5K1.1 and 18 U.S.C. § 3553(e) outlining the extent of his cooperation. (T. Tr. 1338:19–1339:09.)

[7] Law enforcement officials found the promotion letter while executing a search warrant of the defendant's cell. (GX 307 at 6318; T. Tr. 102:14-15.)

The defendant boasted in written notes and rap lyrics about killing Bajandas and Gonzalez. For example, referring to Gonzalez as one of his "opps," or rivals, he wrote, "Flex / Celebrate when we skore on em / Over BossDon I go to war on em / shots fired! He dead now! . . . 2 to the face plus the and one" (GX 307 at 4199) and "Turn all my opps into ghost / Francisco I mix him w/ Mark" (*id.* at 4290). The defendant wrote in his notes that the murder of Gonzalez "wasn't over pussy, it was over pride." (GX 307 at 4199.)

### b. The Defendant's Case

The parties stipulated that Helen Piper, a criminalist with the New York City Office of the Chief Medical Examiner, compared the defendant's DNA with a DNA sample recovered from the doorknob at 19 Stanley Avenue and concluded that "the results of that testing were in the uninformative range; meaning, the results did not support a conclusion that [the defendant] was included or excluded as a contributor to the sample." (T. Tr. 1520:14-02.) She also compared the defendant's DNA to a sample from Gonzalez's bedroom door; the "results of the comparison revealed [the defendant] was excluded as a contributor to the sample." (T. Tr. 1521:02-07.)

### LEGAL STANDARD

A court evaluating a Rule 29(c) motion views "the evidence in the light most favorable to the prosecution," and will uphold the jury's verdict if it determines that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (citation omitted).[8] Viewing the evidence in the light most favorable to the prosecution means "drawing all inferences in the government's favor and

---

[8] Rule 29 provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(1).

deferring to the jury's assessments of the witnesses' credibility." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (citation omitted). A court "must consider the Government's case in its totality rather than in its parts," and the sufficiency of the evidence test "may be satisfied by circumstantial evidence alone." *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) (citations omitted). A defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (citation omitted).

## DISCUSSION

In seeking relief under Rule 29(c), the defendant challenges two aspects of the jury's verdict — its conclusion that the defendant killed Francisco Gonzalez as part of the operation of GSM, and that he conspired to possess and distribute and did possess and distribute marijuana and cocaine base. As explained below, the jury's conclusion that the defendant was guilty of these acts was rational and supported by the evidence.

### I. Count One, Racketeering Act Three: Murder of Francisco Gonzalez

The defendant claims that the government did not prove that he murdered Francisco Gonzalez to further the enterprise (GSM); instead, he argues, "[t]he only rational view of the evidence is that [he] murdered Mr. Gonzalez because he was jealous of Ms. McCombs's new relationship with Mr. Gonzalez." (ECF No. 138 at 8.) The defendant's able counsel made this argument to the jury, who nevertheless concluded that the murder was related to the racketeering enterprise. That decision was rational.

The RICO statute makes it unlawful for "any person employed by or associated with any enterprise" whose activities affect interstate or foreign commerce "to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this [statute] and the last of which occurred

8

within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The government "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original). "[P]redicate acts must be related to each other and to the enterprise." *United States v. Daidone*, 471 F.3d 371, 376 (2d Cir. 2006); *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) ("The racketeering acts must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness).").

Vertical relatedness "may be established by evidence that the defendant was enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or that the predicate offenses are related to the activities of that enterprise." *Minicone*, 960 F.2d at 1106 (emphasis and internal quotation marks omitted).

The jury could rationally conclude that the murder of Francisco Gonzalez was related to GSM's activities. First, as Jordan Taylor testified, the defendant, as "godfather" of GSM, specifically targeted Gonzalez — labeled him as a "deal" — because Gonzalez smoked marijuana that he was supposed to sell. (T. Tr. 171:14-20, 172:3-15.) An aspiring gang member slashed Gonzalez in the face, an act for which he was rewarded by membership in GSM. (T. Tr. 173:09-21.) Gonzalez was targeted again when he retaliated by shooting at the defendant and other GSM members. (T. Tr. 176:18–177:10.) As Taylor explained, Gonzalez was a "deal" "[f]rom 2018 to the day he was killed." (T. Tr. 473:09-10.)

In addition, the evidence, including video, texts and phone records, showed that the defendant used his leadership position to recruit two GSM associates — Degroat and Jackson —

9

to assist him in setting up the Gonzalez murder, the same two GSM associates who helped him murder Mark Bajandas, a killing that the defendant does not dispute was related to GSM's affairs. The defendant's own words established that he murdered Gonzalez to advance his own standing in GSM, and to further its goals. He celebrated the killing when he wrote, "Turn all my opps into ghost / Francisco I mix him w/ Mark." (GX 307 at 4290.) Moreover, the defendant confirmed that he was not motivated by jealousy when he wrote that the murder "wasn't over pussy, it was over pride." (*Id.* at 4199.)

Under these circumstances, a reasonable jury could find that the defendant "was acting at least in part out of gang-related motives." *United States v. Pippins*, 733 F. Supp. 3d 136, 146 (E.D.N.Y. 2024); *see also United States v. James*, 239 F.3d 120, 124 n.5 (2d Cir. 2000) ("With respect to defendant's contention that [the] murder was an act of personal revenge and was not done in aid of defendant's racketeering enterprise, we agree with the district court that 'one of the motivations for [this murder] was tied to the association with the enterprise and the desire to maintain standing, if you will, in that . . . for lack of a better way of putting it, community.' And this is sufficient, under our precedents, to support a conviction for conspiracy to commit murder in aid of racketeering.").

## II.   Count One, Racketeering Act One A and B, and Count Six:  Marijuana and Cocaine Base Distribution and Conspiracy

The defendant also disputes the jury's conclusion that he possessed marijuana and cocaine base with the intent to distribute (Count One, Racketeering Act One B), and conspired to distribute and possess marijuana and cocaine base with intent to distribute (Count One, Racketeering Act One A, and Count Six). To establish possession with intent to distribute marijuana and cocaine base, the government had to prove (1) that the defendant possessed a controlled substance; (2) that he knew that what he possessed was a controlled substance; and (3)

that he agreed to possess the controlled substance with the intent to distribute it. 21 U.S.C. § 841(a)(1). To establish that the defendant conspired to commit that crime, the government had to prove (1) that two or more people knowingly and willfully conspired, or agreed to distribute or possess with intent to distribute one or more controlled substances; and (2) that the defendant knowingly and willfully joined the conspiracy. *Id*. §§ 841(a)(1), 846.

The defendant does not deny that GSM members sold narcotics. Rather, he asserts that there was insufficient evidence that he was involved in it "in any way shape or form." (ECF No. 138 at 9.) He also stresses that the "government solely relied upon Jordan Taylor's word" and did not "introduce any physical drugs, ledgers, cash, packaging materials." (*Id*.) However, "[a]ll issues of credibility, including the credibility of a cooperating witness, must be resolved in favor of the jury's verdict." *See United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008). Moreover, circumstantial evidence is sufficient to support a conviction. *Wexler*, 522 F.3d at 207.

The jury's decision to credit Jordan Taylor's testimony that the defendant, as the leader of GSM, participated in and directed GSM's drug sales was rational and based on the evidence. Taylor, a member of GSM for two years, testified that the defendant supplied GSM members with drugs to sell in Staten Island, New York and Vermont. (T. Tr. 94:11-13, 289:20–291:09, 292:02-05; GX 355.) The defendant received a portion of the profits from drug deals because of his status as GSM's leader. (T. Tr. 153:02-16.) GSM members cooked drugs in the defendant's apartment (T. Tr. 289:20–290:14), and they stored drugs in a drug addict's apartment in the same building (T. Tr. 290:15–291:09; GX 3012A). The defendant also personally sold drugs in Vermont. (T. Tr. 320:04-06, 1055:11-24.)

Although Taylor's testimony was sufficient to establish the defendant's guilt of these charges, it was not the only proof of the defendant's role in the drug-selling aspect of the

11

enterprise. GSM members' text messages and social media communications demonstrated that drug dealing was a core activity for GSM members. (*See* T. Tr. 1423:06–1428:01; GX 3101, 3103, 3122, 3124, 3147, 3147B, 3148A.) Jada McCombs corroborated Taylor's testimony, and testified that she and the defendant took the bus to Vermont so that he could sell drugs there. (T. Tr. 1055:11-24.) The defendant referred to that trip in his notes when he wrote "outta town . . . on the bus." (GX 307 at 6278.)

Based on these facts, the jury's decision that that the defendant possessed with intent to distribute illegal drugs and conspired to possess with intent to distribute illegal drugs was rational. *See United States v. Swinton*, No. 23-6118, 2024 WL 1564487, at *3 (2d Cir. Apr. 11, 2024) ("While it is true that this is circumstantial rather than direct evidence of Swinton's possession and distribution of narcotics on December 8, 2018, 'the government is entitled to prove its case solely through circumstantial evidence.'"); *United States v. Johnson*, 633 F.3d 116, 118 (2d Cir. 2011) ("It is well-settled that individual defendants are responsible for all reasonably foreseeable quantities of drugs distributed by a conspiracy of which they were members.").

\*     \*     \*

The Court has "examine[d] the entire case, take[n] into account all facts and circumstances, and [made] an objective evaluation." *Aguiar*, 737 F.3d at 264 (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). "[V]iewing the evidence in the light most favorable to the prosecution," "deferring to the jury's assessment of the witnesses' credibility," and considering the evidence "in its totality, not in isolation," the Court finds that the defendant has not sustained his "heavy burden" to show that he is entitled to relief under Rule 29. *Id.* (citations omitted). A rational jury could conclude from all the evidence that the defendant

murdered Francisco Gonzalez as part of the GSM enterprise, and that he possessed with intent to distribute, and conspired to distribute and possess with intent to distribute, marijuana and cocaine base.  Accordingly, the motion for acquittal is denied.

## CONCLUSION

For these reasons, the defendant's motion for acquittal is denied.

**SO ORDERED.**

                                                  s/Ann M. Donnelly
                                                  ANN M. DONNELLY
                                                  United States District Judge

Dated: Brooklyn, New York
        April 17, 2025